The **FARMERS BANK OF CLINTON, MISSOURI, Appellant,**

v.

Vance **JULIAN, Trustee in Bankruptcy of Roby C. Woody, d/b/a Woody Motor Company, Bankrupt, Appellee.**

No. 18588.

United States Court of Appeals
Eighth Circuit.

Aug. 8, 1967.

Rehearing Denied Sept. 5, 1967.

Certiorari Denied Dec. 18, 1967.

See 88 S.Ct. 593.

Alvin D. Shapiro, Kansas City, Mo., made argument for appellant, and Michael J. Bogutski, Kansas City, Mo., was with him on the brief, Stinson, Mag, Thomson, McEvers & Fizzell, Kansas City, Mo., of counsel.

Phineas Rosenberg, Kansas City, Mo., made argument for appellee.

Before VOGEL, Chief Judge, GIBSON and HEANEY, Circuit Judges.

GIBSON, Circuit Judge.

This appeal concerns the Referee in Bankruptcy's orders disallowing alleged secured claims, ordering a turnover of certain alleged preferences, disallowing a bank account setoff as a preference, and subordinating appellant's secured claim to those of the general creditors of the bankrupt estate.

This appeal covers only a part of the bankruptcy administration in the Roby C. Woody bankruptcy, there being other appeals pending relative to other phases of the administration of the bankrupt estate.· The District Court on Petition for Review sustained all of the Referee's findings and orders against appellant.

Roby C. Woody, d/b/a Woody Motor Company, commenced business on April 15, 1945, in Clinton, Missouri, as a franchised Cadillac and Oldsmobile dealer. He conducted the usual retail auto sales and service business of a franchised dealer, selling new and used cars, carrying a parts inventory, and maintaining service equipment necessary to operate an automobile agency. The bankrupt, Woody, utilized the financial services of the appellant, along with other banks and the large automobile financing credit institutions of GMAC, Commercial Credit Corporation and possibly C. I. T.

## NOVEMBER 1957 LOAN

On November 22, 1957 Woody borrowed $16,000.00 from The Farmers Bank of Clinton, Missouri (hereafter referred to as "appellant" or "Bank"), secured by a note and chattel mortgage on "All machinery and shop equipment, Oldsmobile special tools, Cadillac special tools, furniture, fixtures, and parts bins, parts, accessories, oil and grease, and paint now owned, or hereafter purchased during the life of this loan, by Woody Motor Company, R. C. Woody sole owner." This chattel mortgage was duly filed of record the following day. The note secured by the chattel mortgage called for payments of $1,000.00 per month plus interest, for five months with a final payment of $11,000.00 due on May 22, 1958.

The monthly payments were made as agreed but the final payment of $11,-000.00 was not made as called for in the note on the due date, though the $1,000.00 monthly payments were continued until August 27, 1958, at which time there remained a balance of $7,000.00 due on the note. An oral extension of the note was

made, according to the parties, with interest being paid monthly and subsequently two $500.00 payments were made, bringing the balance on the note down to $6,000.00 as of June 4, 1959.

## MAY 12, 1959 LOAN

In the spring of 1959 Woody furnished the Bank with his financial statement dated March 31, 1959, which also included a Profit and Loss Statement of his operations for the first three months of 1959. This statement showed a net worth of $113,713.06 and a profit of $17,-305.67 for the three-month period. On May 12, 1959 the Bank lent Woody an additional $12,000.00 evidenced by a note due in seven days and secured by a chattel mortgage on some automobiles. The chattel mortgage was not filed of record. Woody represented to the Bank that he needed the money for operating capital until a major loan could be obtained from Commercial Credit Corporation. The sum of $9,000.00 was repaid on this loan by June 3, 1959, leaving $3,000.00 balance due.

## JUNE 3, 1959 LOAN

On June 3, 1959, Woody borrowed an additional $16,000.00 from the Bank, $3,000.00 of which was credited to the balance owing on the May 12 loan, discharging the May 12 loan. The remaining $13,000.00 of this loan was deposited to Woody's bank account and the loan was secured by a chattel mortgage on certain automobiles but was not filed of record. This loan was payable on demand.

An agent of the Commercial Credit Corporation was scheduled to be in Woody's place of business on about June 23, 1959 to finalize Woody's application for a major operating loan but was delayed one week in arriving. The Bank agreed to go along with Woody during this interim period. The agent of the Commercial Credit Corporation did appear on June 30, 1959 and when an officer of the Bank conferred with him and Woody at Woody's place of business, the officer found out that Commercial Credit would not make the loan until it had a detailed audit of Woody's operation. Woody and the Commercial Credit agent then requested the Bank to make a long-term loan to Woody.

At this point the officer of the Bank decided that Commercial Credit would not make the long-term operating loan. He then returned to the Bank and applied a setoff of $9,733.88 in Woody's bank account to the $16,000.00 indebtedness of June 3, 1959. On the following day, July 1, 1959, Woody gave the Bank a note and chattel mortgage on several motor cars for the remainder of the $16,000.00 indebtedness, namely $6,266.12. This chattel mortgage was filed on July 2, 1959. The cars covered under the mortgage were repossessed on either July 4 or 5, 1959, and subsequently sold for $4,850.00. A return premium on an insurance policy provided the Bank $550.00 and Jerry Woody, a third person, paid the Bank the remaining balance of $866.12—due on this indebtedness.

In addition to Woody's indebtedness to the Bank, the Commercial Credit Corporation was given a note and chattel mortgage on July 1, 1959, recorded July 2, 1959, that covered the same property as is described in the Bank's November 22, 1957 chattel mortgage, and was made "subject to the first chattel mortgage of record" to the Bank. On July 8, 1959 the Commercial Credit filed a replevin action against the items covered by its chattel mortgage. The next day, July 9, 1959 Woody made an assignment for the benefit of creditors.

An involuntary petition in bankruptcy was filed July 13, 1959. Woody filed an answer on the same date admitting that he was insolvent, and an adjudication of bankruptcy and order of general reference was made July 14, 1959. Vance Julian was duly appointed as the Receiver and later as Trustee for the property and assets of the bankrupt.

The Trustee recovered the furniture and fixtures, the shop equipment, parts and chattels used in Woody's business from Commercial Credit. The Trustee valued these assets in his Petition for

Order of Sale at $30,394.43.[1] This property was ordered sold free and clear of all incumbrances on November 5, 1959 and was actually sold on November 9, 1959 at a private sale for $23,000.00.

The Bank filed its claim as a secured creditor for the $6,000.00 together with interest at 7 percent from June 4, 1959 on the balance due on its note and chattel mortgage of November 22, 1957. The Trustee objected to the allowance of the claim and asserted in addition that the Bank had received within four months of the filing of bankruptcy void or voidable preferences and void and voidable transfers on account of antecedent and other debts while Woody was insolvent and at a time when the Bank had reasonable cause to believe that Woody was insolvent.

The Referee ruled the chattel mortgage of November 22, 1957 invalid, that the repayment of the $12,000 note of May 12, 1959 was a preference, that the repayment on the $16,000.00 note of June 3, 1959 was "a preference and/or fraudulent" (to the extent of $13,000.00) and that the Bank was not entitled to a setoff of $9,733.88 in Woody's bank account as he found the account had been "built up * * * under prearrangement". The Referee directed the Bank to turn over $25,000.00 to the Trustee and then conditioned on compliance with the turnover order allowed the Bank's claim as a subordinate and inferior claim to the rights of general creditors.[2]

## STANDARD OF REVIEW

The Bank contends the Referee's findings and orders issued pursuant thereto and the District Court's approval of them on review were, in the respects complained of, clearly erroneous.

General Order in Bankruptcy No. 37 makes the Federal Rules of Civil Procedure applicable to bankruptcy proceedings "insofar as they are not inconsistent with the Act" and commands that these

---

1. "(a) Automobile parts, accessories, and supplies appraised at ... $19,149.05
   "(b) Oil, grease, and anti-freeze appraised at ................ 1,773.53
   "(c) Office equipment appraised at ........................ 1,157.70
   "(d) Shop equipment appraised at .......................... 6,292.15
   "(e) Steel bins for automobile parts appraised at .............. 2,022.00

   Total ....................... $30,394.43"

2. In summary, there are three basic loan transactions in this dispute:

   I. $16,000.00 on November 22, 1957 secured by a recorded chattel mortgage. At the time of bankruptcy, $6,000.00 remained unpaid on this loan. The Bank filed a claim asserting a secured position. The Referee found the security to be invalid and further held that the Bank's claim should be subordinated to that of the general creditors.

   II. $12,000.00 on note and unrecorded chattel mortgage of May 12, 1959, which was paid down to $3,000.00 by June 3, 1959. The Referee held that the repayment of this loan constituted a preference.

   III. $16,000.00 on note and unrecorded chattel mortgage of June 3, 1959.

   (a) $3,000.00 was applied to the May 12 loan thus discharging that indebtedness.

   (b) The $16,000.00 debt was satisfied by Bank in the following manner:

   (1) $9,733.88 was set off by the Bank on June 30, from a checking account maintained by Woody. The Referee held that this setoff was collusive and void.

   (2) Chattel mortgage of July 1, 1959 under which Woody's cars were seized and sold for $4,850.00. The Referee held this security void as it was for an antecedent debt.

   (3) Payment from third party sources: $550.00 from an insurance premium and $866.12 by Woody's son.

   The Referee issued a turnover order covering the $12,000.00 repayment on the May 12, 1959 loan and the repayment of the $13,000.00 secured from the Bank on the June 3, 1959 loan of $16,000.00. Total turnover order of $25,000.00.

Rules "be followed as nearly as may be." [3]

Rule 52(a) Fed.R.Civ.P., states that "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Likewise, under General Order in Bankruptcy No. 47, unless otherwise directed in the order of reference the Referee "shall set forth his findings of fact and conclusions of law, and the judge shall accept his findings of fact unless clearly erroneous."

In applying and interpreting the "clearly erroneous" standard, the courts have used varying language to indicate the thrust and limitations of this principle. The Supreme Court in United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L. Ed. 746 (1948) said: "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." This language is later quoted with approval in Commissioner v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960).

In Magidson v. Duggan, 212 F.2d 748, 752–753 (8 Cir. 1954) cert. denied 348 U.S. 883, 75 S.Ct. 124, 99 L.Ed. 694 Judge Sanborn paraphrased the Rule as follows:

"The findings of fact of a trial court are clearly erroneous within Rule 52 of the Federal Rules of Civil Procedure, 28 U.S.C.A., when (1) not supported by substantial evidence, (2) contrary to the clear preponderance of the evidence, or (3) based upon an erroneous view of the law. Aetna Life Insurance Co. v. Kepler, 8 Cir., 116 F.2d 1, 5; Kasper v. Baron, 8 Cir. 207 F.2d 744, 748."

In O'Rieley v. Endicott-Johnson Corporation, 297 F.2d 1, 6 (8 Cir. 1961), Judge Blackmun views the "clearly erroneous" standard as:

"* * * that is, whether, although there is supporting evidence, 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed', United States v. United States Gypsum Co., 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746; Commissioner of Internal Revenue v. Duberstein, 1960, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218, or whether 'they are based upon a substantial error in the proceedings or upon a misapplication of the controlling law, or if they are unsupported by any substantial evidence, or if they are contrary to the clear weight of all the evidence'. Kauk v. Anderson, 8 Cir., 1943, 137 F.2d 331, 333. See Pendergrass v. New York Life Ins. Co., 8 Cir., 1950, 181 F.2d 136, 138."

We now proceed to review the Referee's findings applying the "clearly erroneous" standard.

## WAS THE BANK A SECURED CREDITOR UNDER THE NOTE AND MORTGAGE OF NOVEMBER 22, 1957?

The Referee found "for a period approximating two years prior to bankruptcy, * * * [the Bank] made no effort to act promptly (under the powers granted to it in said default clause) to foreclose its lien or exhaust its rights" and was passive as to its claim thereunder and "permitted the same to lie dormant for said two-year period and did nothing as to bankrupt's breaches and defaults of said prior mortgage * * *",

---

3. This Court in an opinion by Judge Blackmun in O'Rieley v. Endicott-Johnson Corporation, 297 F.2d 1 (8 Cir., 1961), pointed out that under General Order in Bankruptcy No. 37, 11 U.S.C.A. following § 53 provides that the Federal Rules shall be followed in bankruptcy proceedings "as nearly as may be." and states at p. 4:

"It has been held specifically that Rule 52(a) applies to bankruptcy proceedings. United States Machinery Movers v. Beller, 8 Cir. 1960, 280 F.2d 91, 94, cert. den. 364 U.S. 903, 81 S.Ct. 236, 5 L.Ed. 2d 195; In re Rockford Baseball Club, 7 Cir., 1953, 201 F.2d 685, 686."

and that the claim became inferior and subordinate to the rights of general creditors.

The undisputed facts show that this note and chattel mortgage were given for a valid consideration; that $16,000.00 was advanced and paid to Woody; that monthly payments of $1,000.00 plus interest were paid each and every month to and including August 1958, leaving a then balance of $7,000.00; that although the $11,000.00 balloon balance due in May 1958 was not paid on the due date, the note was orally extended and the $1,000.00 monthly payments were continued to and including August 1958 and the interest was paid monthly thereafter until June 4, 1959.

Under § 443.460 RSMo 1959, V.A.M.S. the chattel mortgage was a valid security instrument, the due filing thereof served as constructive notice of its provisions and it remained valid under § 443.500, RSMo 1959, V.A.M.S. for a period of five years. We are concerned only with that part of the mortgage covering the fixtures and shop equipment and not that of the movable stock of goods, such as the parts, accessories and goods held for sale to the public as an inventory stock in trade. Woody testified that the furniture and fixtures, tools and shop equipment covered under the November 1957 chattel mortgage were the same fixtures and equipment that was on hand at the time of the bankruptcy.

The Trustee has indicated that some additions or improvements might have been made on the fixtures and equipment, but there is no probative evidence to this effect. Woody testified that it was the same equipment. The Bank did testify through its officers that Woody was expanding his operation and that Woody always kept on hand up-to-date tools and equipment, but this alone is not evidence of replacement of fixed assets covered under the chattel mortgage. In addition to the enumerated items, the chattel mortgage covered "and the increase thereof."

This chattel mortgage was only nineteen months old at the time of the bankruptcy, had been paid down from $16,000.00 to $6,000.00 and was certainly not, as found by the Referee, to have been in default approximately two years. An agreement to entend the time to pay off a note secured by a mortgage does not have to be in writing. Fisher v. Stevens, 143 Mo. 181, 44 S.W. 769 (Mo.1898); Baade v. Cramer, 278 Mo. 516, 213 S.W. 121 (Mo.1919). An extension of a note, under Missouri law, does not destroy or in any way impair the security, which continues so long as the debt remains unpaid. Christian v. Newberry, 61 Mo. 446, 451 (1875).

Lippold v. Held, 58 Mo. 213, 216–217 (1874) states "the general rule is, that no mere change in mode and time of payment, nothing short of actual payment of the debt or an express release, will operate as a discharge of the mortgage. The lien lasts as long as the debt, * * *." Though *Lippold* deals with a real estate mortgage, the same principle is applicable to personal property. There is no requirement under Missouri law that a creditor foreclose his lien immediately upon default. Nor is it unlawful or sinister for a creditor to carry along a debtor. Particularly is this true when that debtor is operating a going business, utilizing other services furnished by the creditor, is expanding operations, and furnishes a balance sheet showing a net worth of over $113,000.00 and a first-quarter profit of over $17,000.00.

Trustee also contends that the Bank waived its chattel mortgage lien of November 1957 by failing to assert it against the replevin suit of Commercial Credit and later when the property was in the Trustee's possession, who subsequently sold it under Court order free and clear of liens.

There was no concealment of this lien. It was filed of record, which is notice to all. The Bank was under no legal duty to act at the time of the replevin suit as the Trustee had the right

of possession, which he did obtain. The Court ordered this property sold free and clear of liens, which is the usual procedure in these type of cases and any valid lien on the chattels is transferred to the proceeds of the sale. Coulter v. Blieden, 104 F.2d 29 (8 Cir. 1939), cert. den. 308 U.S. 583, 60 S.Ct. 106, 84 L.Ed. 488; Van Huffel v. Harkelrode, 284 U.S. 225, 52 S.Ct. 115, 76 L.Ed. 256 (1931).

█ We believe the Referee's finding and order invalidating the secured claim of $6,000.00 plus interest under the November 22, 1957 note and chattel mortgage clearly erroneous as without any substantial evidentiary support. The claim should be allowed as a secured claim. There were sufficient assets received on the sale of the bankrupt's property covered by this chattel mortgage, exclusive of the movable stock of goods, to pay the claim in full.

## SUBORDINATION OF THE BANK SECURED CLAIM ON ITS CHATTEL MORTGAGE OF NOVEMBER 22, 1957.

█ The Referee, in addition to denying the Bank the status of a secured creditor on its chattel mortgage claim for the balance of the note executed November 22, 1957, subordinated it to the claim of general unsecured creditors. The Supreme Court in Pepper v. Litton, 308 U.S. 295, 296, 306–307, 60 S. Ct. 238, 245, 84 L.Ed. 281 (1939), points out that courts of bankruptcy are essentially courts of equity and in connection with the allowance and disallowance of claims, the court has the power " * * * to disallow or to subordinate such claims in the exercise of its broad equitable powers. * * * The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arms' length bargain."

Most subordination cases deal with unconscionable claims. *Pepper* revealed a scheme to defraud creditors and the subordination power is usually exercised against corporate insiders who take advantage of their position and knowledge to defraud creditors. In re V. Loewer's Gambrinus Brewing Co., 74 F.Supp. 909 (S.D.N.Y.1947) affd. 167 F.2d 318 (2 Cir. 1948), approved subordination of claims of officers, directors and stockholders that did not carry the earmarks of an arms' length bargain. Braddy v. Randolph, 352 F.2d 80 (4 Cir. 1965), was another insider case in which the corporate president's claim and deed of trust were subordinated to claims of creditors, because of initial under-capitalization and mismanagement of the Corporation.

This Circuit in In re Kansas City Journal-Post Co., 144 F.2d 791 (8 Cir. 1944), in an opinion by Judge Johnsen exhaustedly reviewed the law on bankruptcy subordination of claims. That case, at page 800 points out that while bankruptcy proceedings are a composite of law and equity jurisdiction under § 11 of Title 11, U.S.C. the court essentially, in dealing with creditors' claims, sits as a court of equity: (under Pepper v. Litton) "but 'not without appropriate regard for rights acquired under rules of state law', Prudence Realization Corporation v. Geist, 316 U.S. 89, 95, 62 S. Ct. 978, 86 L.Ed. 1293"; that "Subordination is a means of regulating distribution results in bankruptcy by adjusting the order of creditors' payments to the equitable levels of their comparative claim positions;" and

"As indicated above, its fundamental aim is to condition or to undo or to offset any inequity in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results. Its most common uses perhaps are to nullify the effect of any fraud that a creditor has committed, to prevent unjust enrichment in a fiduciary relation, and to make the transaction of officers with the corporation conform to their sound realities in the existing situation."

That case dealt with a stockholder and bondholder claim and the Referee's action of subordination against him was disapproved by both the District Court and the Court of Appeals.

This power of subordination must be soundly exercised and it should not operate to take away any rights punitively to which a creditor is justly entitled and thus give it to other creditors who have no fair right to it. *Kansas City Journal-Post* requires either "fraud or inequity" as the proper basis for subordination. Again this Court in Kenneally v. Standard Electronics Corporation, 364 F.2d 642 (8 Cir. 1966) held that the secured claim of a creditor, which had effective control of the bankrupt corporation, should not be subordinated since there was no evidence of actual fraud or unfairness. In other words, "fraud or unfairness" (unfairness is equated with inequity) is essential for a decision to subordinate.

In the case at bar we are dealing with the duly recorded security of the Bank, which had no interests in the bankrupt's operation, except as a creditor supplying the normal banking services of accounts and loans to the bankrupt. There is absolutely no evidence of any fraud or unfair dealing. The Bank went to lengths to aid and assist the bankrupt in his operations and should not be penalized for trying to help the bankrupt keep intact his business. No other creditors were misled or suffered any damage by reason of the Bank extending credit under the November 22, 1957 chattel mortgage. The order of the Referee subordinating this claim is clearly erroneous as being without any evidentiary basis.

### THE REFEREE'S TURNOVER ORDER OF $25,000.00.

The Bank's loan of $12,000.00 to Woody on May 12, 1959 and the subsequent loan of $16,000.00 on June 3, 1959 are the subject of the Referee's turnover order. Before the June loan was obtained, $9,000.00 was repaid by the bankrupt on the May loan, with $3,000.00 of the June loan being used to pay the balance of the May advance. The Referee characterized these loans as temporary financing until Woody could obtain a long-term capital loan from Commercial Credit Corporation or others and held that the Bank was informed of and knew of the bankrupt's financial condition.

The Referee found that the setoff by the Bank of $9,733.88 was a preference; and the Bank acting together with another bank, The First National Bank of Clinton, and in unison and jointly with the bankrupt, had "a collusive pre-arranged and planned formula of action * * * with respect to the concurrent seizure of the bankrupt's bank accounts in such banks and with respect to bankrupt's transfer of free and clear assets to each of the Banks without consideration * * *." This latter transfer by way of the July 1, 1959 chattel mortgage also constituted a preference.

The Bank contends that its advancements of $12,000.00 and $13,000.00 net by these loans were secured by the November 22, 1957 chattel motgage. This so-called open-end chattel mortgage of November 1957 covered future advancements. However, specific chattel mortgages on cars were taken to cover these loans, and no mention was made of coverage of these transactions under the 1957 chattel mortgage. The Bank concedes that the unrecorded chattel mortgages given to secure these loans are void as to creditors and likewise concedes that if these advances were not secured by the November 1957 chattel mortgage the finding of fact that these two loans were unsecured is correct.

We think the Referee's finding on this issue is correct. There is no substantial evidence showing that these loans were to be secured by the November 1957 chattel mortgage. No mention of that mortgage was made at the time of these advances, the taking of new chattel mortgages on cars at the time of the advances and the subsequent taking of the July 1, 1959 chattel mortgage on cars to secure this indebtedness negatives any intention or agreement between the parties that the 1957 chattel mortgage should cover such advances. The Referee's finding that this indebtedness was not properly secured and constitutes only a general unsecured claim is clearly correct and must stand. The May and June chattel

mortgages were void as to creditors because they were not filed of record and the July, 1959 chattel mortgage was a voidable preference as it was given for an antecedent debt.

Taking the loans out of order, we now consider the June 3 loan of $16,000.00 in which the Bank stands as an unsecured creditor.

## WAS THE BANK ENTITLED TO OFFSET THE BANKRUPT'S ACCOUNT AGAINST THE $16,000.00 LOAN?

■ The Bank set off $9,733.88 on June 30, 1959 against the $16,000.00 indebtedness owed the Bank. This amount was in a general checking account used in the ordinary course of business by the bankrupt. Section 68(a) [4] of the Bankruptcy Act, 11 U.S.C. § 108 applies and allows a setoff to the Bank unless the account has been accepted or built up for the real purpose of permitting the Bank to obtain a preference by way of setoff of the account. A bank account at the time of filing the petition in bankruptcy is a debt due to the bankrupt from the bank, and in the absence of fraud or collusion between the bank and the bankrupt, the bank may set the account off against any indebtedness owed it by the bankrupt. New York County National Bank v. Massey, 192 U.S. 138, 24 S.Ct. 199, 48 L.Ed. 380 (1904); Mingus v. Bank of Ethel, 136 Mo.App. 407, 117 S.W. 683 (Mo.App.1909); Lebrecht v. New State Bank of Woodward, 229 S.W. 285 (Mo.App.1921); 4 Collier on Bankruptcy, § 68.16. Section 68(a) of the Bankruptcy Act did not create the right of setoff but it "recognizes this right, and it cannot be taken away by construction because of the possibility that it may be abused." as it "would precipitate bankruptcy and so interfere with the course of business as to produce evils of various and far-reaching consequence". Studley v. Boyl-

ston National Bank, 229 U.S. 523, 529. 33 S.Ct. 806, 809, 57 L.Ed. 1313 (1913).

■ The bank has the right to set off deposits against indebtedness even though the bankrupt is insolvent at the time of setoff and before the petition in bankruptcy is filed. Fourth Nat. Bank of Wichita v. Smith, 240 F. 19 (8 Cir. 1916); In Re Merchandise Mart of Columbia, 79 F.Supp. 686 (E.D.S.C. 1948).

■ The Trustee has the burden of proof of proving a voidable preference by a preponderance of the evidence. City Nat. Bank v. Slocum, 272 F. 11 (6 Cir. 1921) cert. denied 257 U.S. 637, 42 S.Ct. 49, 66 L.Ed. 409; Moran Bros., Inc. v. Yinger, 323 F.2d 699 (10 Cir. 1963).

■ The issue is: Was the account of the bankrupt built up, with the understanding of the Bank, for the purpose of allowing the Bank to use it as an offset and thereby obtain a preference?

The Referee in his turnover order, paragraph 4, evidently considered this setoff as a preference, though he did not definitely state it to be such. However, the net effect of his turnover order of $25,000.00 would necessarily treat the setoff as a preference. The Referee's reasons were that on June 27, 1959, the bankrupt's bank balance was $34.84; on June 29, 1959 it was $10,581.15 plus an additional deposit on that same day of $762.15; and on June 30, 1959 a deposit of $480.00 was made. These deposits built up the account to $11,197.14, which build-up the Referee found to be under "pre-arrangement."

The Bank paid checks on the day of setoff totaling $1,463.26, leaving a balance of $9,733.88, which the Bank set off against Woody's indebtedness on June 30, 1959.

In addition to the evidence cited by the Referee the record shows that this account during the month of June 1959, as

4. "§ 108. Set-offs and counterclaims.
    "a. In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor the account shall be

stated and one debt shall be set off against the other, and the balance only shall be allowed or paid."

in prior months, was an active one. Deposits and withdrawals occurred every business day, the volume of deposits during the month totaled over $175,000.00. On five days during that month, prior to the June 29 deposit of over $10,000.00, deposits in excess of $10,000.00 were made. This account fluctuated widely and on eight days the closing balance exceeded $9,000.00 prior to June 29. The account was twice overdrawn and the account had a balance of over $12,000.00 on June 18, 1959. The average amount of deposits and withdrawals amounted to over $6,000.00. The money was usually withdrawn a short time after it was deposited as Woody was utilizing this money as fast as it became available.

After the Bank made the setoff on June 30, a number of Woody's checks that had previously been written on this account were returned because the account had been closed by the setoff. Woody testified that immediately prior to June 30, 1959 he made no effort to build up the bank account or make deposits other than to cover checks which he had written; and that the deposits were made in the usual course of business.

The Bank did not avail itself of the right of setoff until after an official of the Bank on the morning of June 30 had gone to Woody's place of business to discuss with Woody and an agent of Commercial Credit Corporation the making of a long-term capital loan, which the Bank had been led to believe was in the offing and for which purpose an agent of Commercial Credit had made the trip to Woody's place of business. It was not until the officer of the Bank found out that Commercial Credit Corporation would not make the long-term loan that the Bank proceeded to set off the account. It was at that point that the officer of the Bank returned to the Bank and made an immediate setoff.

The Bank on that same day had already honored a number of checks totaling some $1,400.00. This evidence clearly indicates that there was no collusive build-up of the bank account and that the Bank only decided to make the setoff on the day the setoff was actually executed. The refusal of Commercial Credit to proceed with the long-term capital loan triggered the Bank's decision to avail itself of its setoff right. The pattern of deposits and withdrawals throughout the month is fairly uniform and is certainly in line with the normal business operation of the bankrupt.

The fact that checks were outstanding against the account at the time of setoff negatives any intent on Woody's part to build up the account for the purpose of setoff, and there is absolutely no evidence of any collusive or prearranged plan of action between Woody and the Bank to build up this account.

The Referee's recital of the closing balances on June 27, 1959 and June 29, 1959 might be considered as a scintilla of evidence but the clear weight of the evidence is against the finding of the Referee of a voidable preference on the setoff, and the finding giving effect to a voiding of the setoff is clearly erroneous. We have the definite and firm conviction that a mistake has been committed in not allowing the setoff to stand. Upon reinstating the setoff, it should be applied against the unsecured indebtedness of $16,000.00 owing to the Bank.

This leaves a balance of $6,266.12 properly remaining unpaid of this unsecured $16,000.00 indebtedness. As stated earlier, the Bank attempted to satisfy this remaining indebtedness by taking a chattel mortgage on some of the bankrupt's assets on July 1, 1959 and foreclosing on the mortgage a few days later. The sum of $4,850.00 was secured on the sale of these assets. The July 1, note and mortgage were given on an antecedent debt and thus void as to the Trustee. This sum was properly ordered turned over to the Trustee.

Subsequent to bankruptcy the amount of $550.00 was received from a return of insurance premiums, and $866.12 was paid to the Bank by Jerry Woody, a son of the bankrupt, but a third party to the bankrupt's operation. These payments from third parties do not con-

stitute a voidable transfer under § 60(a)(1) of the Bankruptcy Act as there is nothing in the record to show that these payments were made from or came out of "the property of a debtor". The Trustee in argument concedes these third party payments do not constitute a voidable preference. Thus, they were improperly made a part of the turnover order by the Referee.

In summary, of the $16,000.00 June indebtedness, $9,733.88 was properly set off by the Bank as a mutual indebtedness. The sum of $1,416.12 came from third parties subsequent to bankruptcy. Only the $4,850.00 coming from the sale of assets foreclosed under the voidable July 1 chattel mortgage may be recovered by the Trustee. For that amount the Bank must stand as an unsecured creditor.

### WAS THE REPAYMENT OF THE MAY $12,000.00 LOAN A PREFERENCE?

The May loan was paid by Woody within four months of bankruptcy. On June 3, however, the sum of $3,000.00 remained unpaid. This substantial repayment of the May loan precipitated the June loan of $16,000.00. Woody received $13,000.00 in cash and $3,000.00 went to satisfy the balance of the May loan. These loans actually went to increase the bankrupt's assets and were made in the ordinary course of business to finance Woody as an operating entity.

The Referee held that the payment of the May loan was made while the Bank had "knowledge of bankrupt's insolvency or with reasonable grounds to believe that bankrupt was insolvent." The facts simply do not support this conclusion of the Referee. There is no direct evidence to show that the Bank knew or had reason to know that Woody was insolvent at the time payment was made on this loan. Woody had furnished the Bank with a financial statement dated March 31, 1959 showing a net worth of over $113,000.00 and a quarterly profit of over $17,000.00.

The fact that the Bank granted Woody a $16,000.00 loan on June 3, only a few days following the alleged preferential payments, indicates that the Bank did not believe Woody was insolvent. Obviously, had the Bank believed Woody to be insolvent they would have been extremely reluctant to extent this new credit. Even more obviously, had the Bank suspected that Woody was insolvent they would have been very careful to demand and perfect security on the additional loan. The fact that the Bank failed to perfect the security on either the May or the June loan indicates that it had confidence in Woody's financial condition and did not believe him to be insolvent when the payments were made on the May loan.

It is true the Bank knew Woody was desirous of obtaining some long-term capital financing. However, this is not unusual for any business, especially comparatively small businesses in the throes of expansion. The test for "insolvency" under § 1(19) of the Bankruptcy Act is not the inability to meet current obligations but is the state of having liabilities exceed assets. While Woody's need for capital might indicate inability to meet current obligations, it is but little evidence to support the finding that the Bank should have had knowledge that Woody had liabilities exceeding his assets. The Referee's finding that the Bank had or should have had knowledge of Woody's insolvency is contrary to the clear preponderance of the evidence, and is thus clearly erroneous under Rule 52(a).

Section 57(g) of the Act only requires the surrender of preferences declared to be voidable. Though § 60(a) generally defines a preference, § 60(b) declares to be voidable only those preferential payments made when the creditor at the time of the payment has "reasonable cause to believe the debtor is insolvent." A mere showing of a technical preference under § 60(a) is not sufficient to authorize a turnover order. Campanella v. Liebowitz, 103 F.2d 252 (3 Cir. 1939); 3 Collier on Bankruptcy, § 60.52.

Thus, as the Trustee did not carry his burden of proving that the Bank knew or had reasonable cause to believe that Woody was insolvent at the time of the payments, these preferences were not voidable under the Act and not subject to the Referee's turnover order. However, even if it could be said that the Bank had reasonable cause to believe the debtor was insolvent, we do not believe these payments could be considered preferences under § 60(a) of the Act.

The purpose of the law of preferences is to secure an equal distribution of the bankrupt's assets among his creditors of like class. If a transaction, or series of transactions in their entirety do not interfere with this purpose it does not constitute a voidable preference. Walker v. Wilkinson, 296 F. 850, 852 (5 Cir. 1924), cert. denied 265 U.S. 596, 44 S.Ct. 639, 68 L.Ed. 1198. There is, of course, a particular class of cases which the statute itself allows an offset against the recovery of a preference. Section 60(c) of the Bankruptcy Act provides:

"If a creditor has been preferred, and afterward in good faith gives the debtor further credit without security of any kind for property which becomes a part of the debtor's estate, the amount of such new credit remaining unpaid at the time of the adjudication in bankruptcy may be set off against the amount which would otherwise be recoverable from him."

This is in line with the purpose of the law to require the preferred creditor to surrender only the net amount of the benefit he received in excess of that received by other creditors of his class. To the extent that § 60(c) is consistent with these primary equitable principles it should be applied. However, if exclusively applied in the case before us it does not secure an equitable distribution of the assets in accordance with the principles of the Act.

The $16,000.00 new credit was precipitated by the substantial repayment of the $12,000.00 May loan. Should we

apply § 60(c), to the extent the $16,000.00 loan remains unpaid the Bank is entitled to set it off against the $12,000.00 in preferential payments. However, as the Bank exercised its right of setting off a checking account maintained in the Bank by the debtor prior to the adjudication of bankruptcy, a literal application of the section would only allow the Bank to set off under § 60(c) the amount remaining unpaid after the setoff of these mutual debts as provided in § 68(a). As $9,733.88 was set off from the debtor's account in the Bank, only $6,266.12 actually remained unpaid on the $16,000.00 new credit. Thus, under § 60(c) only $6,266.12 could be set off against the repayment of the $12,000.00 May loan.

This application of § 60(c) results in incomplete relief and consequently in an inequitable distribution of the bankrupt's assets. Had not appellant extended the additional credit, it would stand as an unsecured creditor in the amount of the $12,000.00 May loan, retaining its right of setoff on its debt arising from the checking account. Because of the additional credit appellant stands as an unsecured creditor on $16,000.00. In addition, by the application of § 60(c) appellant must turn over and stand as an unsecured creditor on the $6,266.12 which may not be set off on the preferential repayment of the May 12 loan. Thus the Bank is penalized for the extension of the new credit.

Furthermore, had the Bank waited until after adjudication of bankruptcy to claim its setoff arising from mutual debts, it would have been allowed a full setoff under § 60(c). As appellant had a right under the Act to exercise this mutual debt setoff prior to bankruptcy it is inequitable to penalize the Bank when it so acts by denying it full setoff rights on the new credit. Yet a literal application of § 60(c) results in just such a penalty.

However, § 60(c) is not the exclusive remedy governing the offset of credits. Walker v. Wilkinson, supra. Primary reference should be made to the purposes of the Act to determine if

the transactions would interfere with equal distribution of assets among the creditors of a like class. In so holding the court in Gans v. Ellison, 114 F. 734, 737 (3 Cir. 1902) stated:

"The net balance in favor of the creditor is the real preference under the law. For only to the extent of such net gain does the creditor 'obtain a greater percentage of his debt than any other creditors of the same class.' And so, on the other hand, only to the amount of the net gain to the creditor is the estate of the debtor impaired."

In Kimball v. E. A. Rosenham Co., 114 F. 85, 88 (8 Cir. 1902) this Court held:

"Our conclusion is that the receipt by a creditor of payments upon an account current, in the usual course of business, which are followed by new credits for property delivered to the debtor, which become part of his estate, for which the creditor has not been paid, and which equals or exceeds in amount and in value the payments does not constitute a preference, under section 60(a) * * *."

We recognize that these cases fall into a general "running account rule" which has been widely recognized in bankruptcy law. See, 3 Collier on Bankruptcy, § 57.19[4.1]. Atlas v. Eastern Yarn Mills, Inc., 27 F.Supp. 478 (E.D.N.Y. 1939). Though the facts in the case before us do not show a "running account" we believe the equitable principles that would govern that class of cases are equally applicable to the case before us.

When a creditor in good faith enriches a debtor's estate and this enrichment was caused by the otherwise preferential payment of an outstanding debt, the other creditors are only treated inequally to the extent that the preferential payments exceeded the new advances. If the new credit equals or exceeds the amount of the otherwise preferential payment the other creditors have not been harmed. Consequently, there is no recognizable preference under the equitable principles of § 60(a). How

can it be said that one creditor is preferred over the others when immediately upon payment of a $12,000.00 loan the creditor gives the debtor an additional $16,000.00 in credits and assets? The net result of such a transaction is to enrich the estate of the bankrupt a total of $4,000.00.

Thus, after the alleged preferential payment followed by a new loan the creditors of the bankrupt had $4,000.00 more toward the satisfaction of their claims. Therefore, we cannot see how this transaction of payment followed by new credit of equal or greater amount can be classed as a preference to the Bank. Viewing the transaction as a whole (Schreiber v. Colt, 80 F.2d 511 (10 Cir. 1935); Walker v. Wilkinson, supra,) not only are the other creditors actually benefited, but the Bank received no greater share of the bankrupt's assets than it would had the bankrupt failed to satisfy the May loan.

As these transactions do not interfere with an equal distribution of the bankrupt's assets among creditors of appellant's class, we believe the repayment of the $12,000.00 May loan did not result in a preference to the Bank as it precipitated new assets flowing to the bankrupt in excess of the amount of the payments. Wertz v. National City Bank of Evansville, 115 F.2d 65 (7 Cir. 1940), cert. denied 311 U.S. 675, 61 S.Ct. 41, 85 L.Ed. 424; Gans v. Ellison, supra; Kimball v. E. A. Rosenham Co., supra; Atlas v. Eastern Yarn Mills, Inc., supra.

### SUMMARY

In a recapitulation of this sad episode in the affairs of the bankrupt we are of the opinion that the balance due the Bank on the November 1957 loan is validly secured by the recorded chattel mortgage of that date and thus constitutes a secured claim. Payment of the May 1959 loan was not a preference in that the payment secured additional assets to the bankrupt. A balance of $4,850.00 is subject to the Referee's turnover order.

As of June 3, 1959, after the repayment of the May 1959, indebtedness, Woody

was indebted to the Bank in the amount of $16,000.00, exclusive of the debt secured by the chattel mortgage of November, 1957. The chattel mortgage given to secure this $16,000.00 was void as to third parties, it not having been recorded as required under the Missouri law. The subsequent chattel mortgage of July 1, 1959 was void as to third parties, which includes the Trustee, as it was given for an antecedent debt. This leaves the Bank in the position of having a $16,000.00 unsecured debt at the time the setoff from Woody's general checking account in the amount of $9,733.88 was made, thus leaving a balance of $6,266.12 properly remaining unpaid of this unsecured indebtedness.

Subsequent to the bankruptcy, the amounts of $550.00 and $866.12 were received from third parties to the bankrupt's operation, and were properly applied to the unsecured indebtedness of the Bank, thus leaving the Bank with an unsecured indebtedness of $4,850.00. This indebtedness was satisfied by the Bank's foreclosure of the voidable July 1 mortgage, and as such, may be recovered by the Trustee.

The Trustee, in addition to asking the Court to sustain all of the Referee's turnover order, asked that the Referee's order be modified to include as a part of that order and in addition thereto an order on the Bank to return the $9,733.88 which it set off from the bankrupt's account. We need no further discussion on this matter for two reasons: 1) the setoff was proper; and 2) this modification would obviously call upon the Bank to return double the amount it actually received in the setoff since the setoff was already ordered repaid by the inclusion in the accounting on the $25,000.00 turnover.

The judgment below is reversed and remanded with instructions to modify the turnover order to find as a preference the payment of $4,850.00 received by the Bank in payment of its unsecured indebtedness, which amount remains an unsecured claim against the bankrupt, subject to allowance upon compliance with the turnover provisions of § 57(g) of the Bankruptcy Act, 11 U.S.C. § 93.

Judgment reversed in part, modified and remanded for further proceedings consistent with this opinion.