**In the Matter of TOWNSEND & WALL CO., Debtor.**

**TOWNSEND & WALL CO., Plaintiff,**

**v.**

**RETAIL RESOURCES, LTD., Defendant.**

Bankruptcy No. 83–01351–SJ–11.
Adv. No. 83–1174–SJ–11.

United States Bankruptcy Court,
W.D. Missouri,
St. Joseph Division.

Dec. 21, 1983.

Arthur B. Federman, Linde, Thomson, Fairchild, Langworthy, Kohn & Van Dyke, Kansas City, Mo., for plaintiff.

Michael H. Wetmore, Popkin, Stern, Heifetz, Lurie, Sheehan, Reby & Chervitz, St. Louis, Mo., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND FINAL JUDGMENT DENYING PLAINTIFF'S COMPLAINT AND GRANTING DEFENDANT'S COUNTERCLAIM IN PART

DENNIS J. STEWART, Bankruptcy Judge.

This is an adversary action initiated by the plaintiff seeking a decree of the bankruptcy court subordinating its postpetition indebtedness to plaintiff under the doctrine of "equitable subordination". The defendant has counterclaimed to recover the amount of the postpetition indebtedness.

The facts upon which the determination must be made were evidenced to the court in a hearing of the merits conducted on December 15, 1983, attended by counsel and officers of both parties. They are as follows: After the inception of these chapter 11 proceedings, the plaintiff debtor-in-possession entered into a written agreement with the defendant which contemplated a promotional sale of dry goods in the debtor's store in St. Joseph, Missouri, characterized by public advertisements and the replenishment of the debtor's stock to a degree which the defendant believed to be appropriate under the circumstances. The cardinal and material provisions of the contract almost without exception operated in favor of the defendant, granting it "sole discretion" as to the quantity, quality and type of merchandise to be used in the sale;[1] immediate payment of 60% of the sale price of the goods when sold, which goods were consigned to the debtor, but remained the property of the defendant;[2] an additional commission of 10% of the gross sale during

---

1. Paragraph 4(a) of the governing agreement provides as follows: "Resources shall, in its sole discretion, supply to Debtor during the period of the sale all additional merchandise required in the operation of Debtor's business. Said merchandise shall be delivered on a consignment basis as hereinafter set forth. The decision as to the type, quantity and quality of merchandise shall be solely in the discretion of Resources ..."

2. According to paragraph 5(d) of the agreement, "Resources shall have a security interest in all such merchandise until same is sold by Debtor in the regular course of its business and its security interest shall continue in the proceeds." And paragraph 5(e) is to the following effect: "Upon the sale by Debtor of the consigned merchandise, sixty percent (60%) of the 'retail price' at which the merchandise was billed to Debtor by Resources shall be segregated and held in trust for Resources. This sixty percent (60%) shall be considered the cost of the merchandise to Debtor. At the close of business each day said segregated sums shall be paid to Resources."

the time period of the sale conducted pursuant to the agreement;[3] the right to stop shipping merchandise to debtor without notice for any default of debtor in any respect;[4] and the right to declare default under various circumstances.[5] The court approved this postpetition contract, recognizing as a general principle that parties dealing with debtors in reorganization proceedings are justified in demanding and making contractual provisions which protect them against overextension and loss in the event of the debtor's failure.

The sale pursuant to the agreement was supposed to begin on September 8, 1983. But, as of that date, the defendant was either not able or not willing to consign merchandise to the debtor in sufficient measure to provide a basis for the beginning of the sale. In many ways, also, the promotional campaign which preceded this date was not sufficient to attract any amount of customer traffic. This situation continued to exist throughout the months of September 1983 and October 1983. Joseph Price, the chief executive officer of the debtor, urged the defendant to commence its shipments in accordance with a pre-contractual suggestion of defendant's affairs that they would "fill the store" with merchandise. But, for one reason or another, because of their concern with the debtor's ability to pay or because of their judgment that the time was not ripe for shipment or because of their inability or unwillingness to make shipment of merchandise, the defendant did not comply with any of Mr. Price's requests. At length, at the instance of the creditor First National Bank of St. Joseph, the court directed that the planned sale commence on October 31, 1983, which it did. But the defendant still failed and refused to send the shipments of merchandise

in quantity, type and quality which Mr. Price believed necessary and which, based upon the store's prior sales record, could have produced a satisfactory sale and the underpinnings of a successful rehabilitation of the debtor. In his testimony, Mr. Buxbaum, the president of the defendant, assigned various and sundry reasons for the failure to make shipments of merchandise to the debtor, including the "absence of traffic" in the debtor's store, the failure of the debtor timely to remit payments on account of sold goods, and other problems relating to the inability or unwillingness to make shipments. The debtor, according to the uncontradicted testimony of Mr. Price, in fact utilized the proceeds of the sale of goods solely to defray expenses which were absolutely necessary to the continuation of the sale and the debtor's business, but did not seek advance permission of the defendant to do so. The last shipment, not large in its substance, nor significant in the character of goods shipped, was received by the debtor on November 9, 1983. In large, the debtor received only a smattering of goods, sold them for total monies of $50,000.00 or less, and never did receive any quantity of goods which men of ordinary common sense would consider necessary to the conduct of a sale—men's suits and coats, items of ladies' apparel, sport clothing and the like. The defendant now claims it was willing and able to make shipments of such items as of the time of debtor's filing the within complaint, but "diverted" such shipments because of the filing of the complaint.

■ On the basis of these facts, when the parties have unequivocally contracted to leave the matter of the quality, quantity and type of merchandise to be supplied to the "sole discretion" of the defendant and

---

**3.** Paragraph 6 of the agreement provides: "In consideration of all services rendered by Resources to Debtor pursuant to this Agreement, Debtor agrees to pay Resources ten percent (10%) of the gross receipts attributable to all sales of merchandise made during the period of the sale . . ."

**4.** See paragraph 17 of the agreement.

**5.** See paragraph 4(b) of the agreement to the effect that "In the event Debtor is in default under any term of this Agreement, Resources at its sole option, and without notice and including its exercise of any other remedy it may have, may withhold further shipments of merchandise to Debtor, until Debtor shall cure such default and provide Resources with adequate assurances that no such defaults shall occur in the future."

the defendant, the court has little chance except to give effect to the letter of the contract. In respect of contracts which make one party the sole arbiter of the quality, quantity and type of work to be done or goods provided, the party to whom such discretion is confided is ordinarily "the sole judge of the quality of work done, and his right to accept or reject it is absolute, conclusive, and binding upon the parties, without the investigation of his reasons, unless he acts fraudulently". *Tow v. Miners Memorial Hospital Association,* 305 F.2d 73, 76 (4th Cir.1962). Under Missouri law, which ccontrols the contract at bar, the party in whom discretion is vested "must exercise that judgment in good faith and as a reasonable man [and] . . . may not act arbitrarily or capriciously and there must be a bona fide reason for his dissatisfaction". *Long v. Huffman,* 557 S.W.2d 911, 916 (Mo. App.1977). "[U]nless it clearly appears from the contract that the examining party is to have the power to exercise arbitrary judgment, the person so acting cannot exercise such judgment in a way which is arbitrary, capricious or in bad faith. In other words, he couldn't declare a title, plainly marketable, to be unmarketable, and thus relieve either of the parties from the duty to consummate." *Norman v. McLelland,* 354 S.W.2d 906, 911 (Mo.App.1962). But, as in the action at bar, where the party invested with the discretionary power can cite some reasons for action or inaction rooted in their expertise, the courts find it difficult to overturn the exercise of discretion, even in cases like this in which the court, if entitled to make the initial judgment, would have decided it in a manner contrary to that in which the discretion was exercised. When the defendant was, by the unambiguous words of the governing contract, the "sole" person entitled to make this initial judgment and purports to have done so because of indications of lack of sufficient store traffic and concern over the debtor's early pattern of nonpayment for consigned goods, this court would be rewriting the contract to impugn that decision.

Nor, apart from considerations of breach of the contract, is there any ground for application of the doctrine of "equitable subordination" of the defendant's claim for the amounts due it under the contract. On the basis of the foregoing findings and conclusions, it is not possible for the court to find any misconduct or inequity warranting the invocation of the doctrine of equitable subordination. Generally speaking, "[e]quity follows the law . . . [W]herever the rights or the situation of the parties are clearly defined and established by law, whether it be common or statutory, equity has no power to change or unsettle those rights or that situation". *Straube v. Bowling Green Gas Co.,* 360 Mo. 132, 227 S.W.2d 666, 671 (1950). Accordingly, it has been held that the bankruptcy court's "power of subordination must be soundly exercised and it should not operate to take away any rights punitively to which a creditor is justly entitled and thus give it to other creditors who have no fair right to it". *Farmers Bank of Clinton, Missouri v. Julian,* 383 F.2d 314, 323 (8th Cir.1967). And, in this case, in which the contract unequivocally permits the retention of an ownership interest by the defendant in the goods shipped [6] and their proceeds, that principle has particular application. It would, in fact, constitute "unjust enrichment" to permit subordination of the debt owed to the defendant on account of the goods shipped in the sense that the debtor would then "ha[ve] and retain . . . money or benefits which in justice and equity belong to another". *Straube v. Bowling Green Gas Co., supra,* 227 S.W.2d at 671. And the court cannot flout equity in any misguided attempt to do equity. Accordingly, it must, according to the unequivocal terms of the contract which it formerly approved at the instance of the debtor, grant the defendant's counterclaim for payment on the goods which it has consigned to the debtor.

■ The same principles apply to the defendant's counterclaim for the 10% commission on gross sales made during the course of the sale. Again, the contract was approved by the court for payment as an

**6.** See note 2, *supra.*

administrative expense necessary to the continued operations of the debtor. Under such circumstances, it would be inequitable not to require payment in accordance with its terms. See, e.g., *Matter of Isis Foods, Inc.,* 19 B.R. 329 (Bkrtcy.W.D.Mo.1982). But, according to the facts found above, the sale can be deemed to have lasted only from October 31, 1983, to November 15, 1983, the date which constitutes a reasonable time after the receipt of the last shipment from defendant by the debtor on November 9, 1983.

It is therefore, for the foregoing reasons,

ORDERED AND ADJUDGED that the within complaint of the plaintiff be, and it is hereby, denied. It is further

ORDERED AND ADJUDGED that the defendant's counterclaim be, and it is hereby, granted in part so as to grant defendant its percentage of consigned goods sold plus 10% of gross sales from October 31, 1983, to and including November 15, 1983.[7]

---

**7.** Pursuant to the oral judgment of the court issued at the conclusion of the hearing, the parties have agreed that the following amounts are owed by plaintiff to defendant: (1) on account of 60% of sold merchandise, the sum of $27,971.00; and (2) on account of 10% of gross sales from October 31, 1983 to November 15, 1983, the sum of $4,215.00.