**In the Matter of JOHNS–MANVILLE CORPORATION, Debtor.**

**Bankruptcy No. 82 B 11656/76.**

United States Bankruptcy Court,
S.D. New York.

Dec. 18, 1986.
As Amended Dec. 19 and Dec. 23, 1986.

Levin & Weintraub & Crames, New York City, for debtors; Michael J. Crames, and Herbert S. Edelman, and Andrew Kress, and Edmund M. Emrich, of counsel.

Davis, Polk & Wardwell, New York City, for debtors; Stephen Case, and Lowell Gordon Harriss, and Laureen Bedell, of counsel.

Milbank, Tweed, Hadley & McCloy, New York City, for Creditors Committee; John J. Jerome, and John Gellene, of counsel.

Fried, Frank, Harris, Shriver & Jacobson, New York City, for Leon Silverman, Legal Representative; Matthew Gluck, of counsel.

Caplin & Drysdale, Chartered, New York City, for Asbestos Health Committee; Elihu Inselbuch, of counsel.

Hahn & Hessen, New York City, for Equity Security Holders Committee; George Hahn, of counsel.

Kronish, Lieb, Weiner & Hellman, New York City, for Certain Holders of Common Stock; Richard Lieb, and Laurence J. Kaiser, of counsel.

Covington & Burling, Washington, D.C., for Armstrong World Industries; David H. Remes, of counsel.

Coleman & Rhine, New York City, for Armstrong World Industries, Inc.; Howard I. Rhine, of counsel.

Jane Bevans, New York City, for Protestant Episcopal Schools.

Greene, O'Reilly, Broillet, Paul, Simon, McMillan, Wheller & Rosenberg, Washington, D.C., for Lawrence Kane Objectors; Vern Countryman, and George Rosenberg, and Michael L. Goldberg, of counsel.

Nathan M. Fuchs, Virginia M. Handal, New York Regional Office United States Securities and Exchange Commission.

Weil, Gotshal & Manges, New York City, for Owens-Illinois; Ellen Werther, of counsel.

Whitman & Ransom, New York City, for U.S. Trust Company of New York; William M. Kahn, of counsel.

Wolf, Popper, Ross, Wolf & Jones, New York City, for Schools Committee; Ellen Chapnick, of counsel.

Gaston, Snow & Ely Bartlett, Boston, Mass., for University of Missouri and Hospitals; Charles F. Vihon, of counsel.

Goldstein & Manello, Boston, Mass., for State Government Creditors Committee; Robert Somma, of counsel.

Earl Parker, for Johns-Manville Corporation.

BURTON R. LIFLAND, Chief Judge.

## I Introduction

Several days ago these huge, complex, unparalleled reorganization proceedings entered into a new phase, when their largely consensual plan was formally brought before this court as a candidate for confirmation.

Manville originally filed its petition for reorganization under chapter 11 in August of 1982. The troubled history of these reorganization proceedings has been discussed in some detail, most recently in *Equity Security Holder's Committee v. Johns-Manville Corp., (In re Johns-Man-*

*ville Corp.*), 66 B.R. 517 (Bankr.S.D.N.Y. 1986), *aff'd mem,* (S.D.N.Y. December 9, 1986). There is little need to review the Manville saga today, except to highlight some of the most recent events in the case. On November 20, the Debtor announced preliminary voting results on its reorganization plan. According to those results, the plan was overwhelmingly accepted by Asbestos Health Claimants, Property Damage Claimants, Unsecured Creditors and Preferred Shareholders. Common Shareholders were the only class to reject the plan.

The District Court has upheld this court's recent rulings denying the appointment of official committees to represent equity interests, *Carl M. Albero, Morton Macks et. al. v. Johns-Manville Corp., Official Committee of Unsecured Creditors, United States Trustee, the Official Committee of Asbestos-Related Litigants and/or Creditors and the Legal Representative for Future Claimants. (In re Johns-Manville Corp.),* 68 B.R. 155, (S.D. N.Y. 1986); and its decision enjoining the calling of a meeting of the Debtor's shareholders, *supra.* The Debtor's settlements with its insurance carriers, then totalling more than $700 million, were approved by this court, after a hearing on their fairness, held November 19, 1986. The Debtor subsequently concluded settlements with its remaining carriers. The various chapter 11 cases filed by the Debtor and its subsidiaries were substantively consolidated after a hearing before this court on December 9, 1986.

By means of an order submitted to this court on December 12, 1986, Hahn & Hessen, Esqs. sought to withdraw the objections to confirmation previously filed on behalf of the Official Committee of Equity Security Holders (the "Equity Committee"), its individual members, and any successor committee on November 14, 1986. By endorsement the order was declined because, *inter alia,* it was noted to have been brought inappropriately and in an untimely manner. The withdrawal request was renewed at the confirmation hearing and was again refused. Accordingly, the filed objections shall be considered, along with the others.

The plan is the product of more than four years of effort to grapple with a social, economic and legal crisis of national importance within the statutory framework of chapter 11. Not surprisingly, this largely consensual plan is, by virtue of necessity, both creative and pragmatic in the solutions it proposes in response to the problems that afflict the Debtor, and indeed all parties in this reorganization.

One of the most innovative and unique features of the Manville Plan of Reorganization (the "Plan") is the establishment of two Trusts out of which all asbestos-related claims will be paid. An understanding of the features of these Trusts is necessary before an informed evaluation of the Plan, under the standards of § 1129 can be made.

The Asbestos Health Trust (the "Trust" or the "AH Trust") is a facility designed to resolve the claims of victims of asbestos-related diseases. It should be emphasized that this Trust draws no distinction between victims on the basis of the date of the manifestation of their disease. The Trust will initially be funded with $815 million in cash, receivables and insurance proceeds. The Trust will also receive $75 million per year from Manville for a 24 year period commencing 3 years after its inception. Ultimate funding is in excess of approximately $2.5 billion. In addition, the Trust will own or have access to up to 80% of Manville's common stock. Finally, the Trust will have the right to call on up to 20% of the profits of the corporation, beginning 4 years after its inception and continuing for as long as necessary to satisfy asbestos health claims.

Two aspects of the financial structure of the Trust should especially be noted. First, the Trust, as a fiduciary for asbestos health victims will be the single largest stockholder in the reorganized debtor. The effect of this Plan will be to give the "tort victims" the beneficial interest in the ongoing operating corporate entity. Second, the

622

Trust is guaranteed an "evergreen" source of funding by virtue of its 20% call on profits of the operating corporation. This funding of the Trust will continue until the last asbestos victim is found and paid. Thus an effort to determine the number and amount of AH claims with exactitude is not imperative. The imperative rather, is to ensure to the greatest degree possible the continuing viability of the reorganized corporation, which will fund the Trust, whatever the number and amount of claims happen to be. To protect and preserve the Manville operating entity, to help ensure the Trust's ability to honor its commitments, and to enhance the market value of the Trust's stock, the operating entities will be protected from further asbestos-related litigation by a combination of the discharge provisions of the Code and an injunction order (the "Injunction") prohibiting all parties with asbestos-related personal injury or property damage claims from suing certain protected entities.

The Property Damage Trust (the "PD Trust") is, similarly, a facility for resolving Class 5 asbestos-related property claims. The Trust will be funded initially with $125 million and will be entitled to any insurance settlement proceeds in excess of $615 million. To this will be added the remaining assets of the AH Trust, upon its termination.

A. Objections to Confirmation

Before discussing the Debtor's Plan in the context of § 1129 requirements, the court notes that the following objections to confirmation, many of which are on common grounds, have been filed:

1) A common shareholder, John Mac-Lean, has challenged a provision of the Plan under which attorneys representing asbestos health claimants will be paid legal fees without review of those fees by this court.

2) Several Co-Defendants (the "Armstrong Objectors") have challenged the ability of the Asbestos Health Trust (the "AH" Trust") to satisfy all liabilities assumed by the Trust and provisions of the Plan which the Armstrong Objectors claim would disable the Trust from entering an industry wide claims handling facility, commonly known as the "Wellington Plan".

3) A group of Asbestos Health Victims (the "Kane Objectors") raise the following objections to the Plan:

a) The legal validity of that part of the Plan which seeks to enjoin asbestos-related suits against the reorganized Debtor (the "Injunction");

b) The terms of the Plan which transfer property of the estate to Class 6 claimants in lieu of post-petition interest;

c) The features of the Injunction which disallow punitive damages in asbestos-related claims against the Trusts;

d) The Debtor's estimates of the number of present and future asbestos health claims and the average costs of their disposition and thereby the feasibility of the Plan;

e) The validity of the voting procedures employed with respect to AH Claimants;

f) The Debtor's good faith in proposing the Plan; and

g) The Kane Objectors also assert that the Trust provided for in the Plan essentially amounts to a fraudulent conveyance. The court specifically finds that the Kane Objectors submitted neither credible evidence nor persuasive legal arguments that the provisions of this Plan meet those statutory prerequisites of §§ 544, 547 or 548 of the Code necessary to establish a fraudulent conveyance. Indeed, the court considers this objection only to the extent that it wishes to review all objections to confirmation.

4) The Equity Committee and the Wright Group (the "Equity Interests") have raised the following objections to the confirmation of the Plan:

a) The validity of the Injunction sought under the Plan;

b) The validity of Plan provisions which accommodate for the payment of future claims;

c) That portion of the Plan which provides consideration to Class 6 claimants in lieu of post-petition interests;

d) The provision of the Plan whereby attorneys representing AH victims would receive fees which have not been subject to court review;

e) That the Debtor has not proposed the Plan in good faith;

f) That confirmation votes were solicited on the basis of a misleading Disclosure Statement;

g) That the Plan is not in the best interests of common shareholders;

h) That the Plan is not feasible;

i) The provisions of the Plan which provide for $5 million of Trust funds to be spent on charitable purposes related to the treatment of asbestos-caused diseases; and provisions of the Plan which would allow, upon termination of both the AH and PD Trusts, a portion of the remaining assets in the Trust to be applied to charitable purposes related to the treatment of asbestos related diseases. The $5 million charitable contribution inures to the direct benefit of AH victims and objections to it are unfounded. Objections to the distribution of some of the remaining Trust assets to charitable causes, are based on unrealistic and speculative assumptions which the court does not find credible. Furthermore, this distribution of the remainder of the Trust allows for favorable tax treatment benefiting the Trust which will inure to the benefit of health claimants. *See* Transcript of Fairness Hearing on Insurance Settlements, November 19, 1986, Tr. p. 29–32. Accordingly, these objections provide no obstacle to the confirmation of the Plan and are noted here only in an effort to be thorough.

j) And finally, the Equity Interests object to the confirmation of the Plan on the grounds that it is not fair and equitable.

5) A common shareholder, Action on Smoking and Health ("ASH") objects to confirmation of the Plan on the ground that the Debtor has, in failing to pursue alleged causes of action against cigarette manufacturers, failed to realize all available assets of the estate. ASH neither appeared, nor did it submit evidence in support of its objections at the hearing. Even were its bald assertions found credible, ASH failed to make any cogent demonstration as to the real probability of any asset improvement.

**B. Standing**

Some of the Plan proponents have questioned the standing of each of the Objectors to raise *some* of the challenges to confirmation just enumerated. While § 1109 of the Bankruptcy Code states that "[a] party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter", recent, persuasive case law has limited the standing of parties in interest to object to plan confirmation on appeal. *See, e.g. In re Evans Products Co., et al.,* 65 B.R. 870, 874 (S.D.Fla.1986) ("Appellants have standing only to challenge those parts of a reorganization plan that affects their direct interests."), *and In re Fondiller,* 707 F.2d 441 (9th Cir.1983) (only "aggrieved persons" may *appeal* an order of the Bankruptcy Court), *and In re Sweetwater,* 57 B.R. 743, 746 (D.Utah 1985) ("This court interprets the 'aggrieved person' test to mean that an appellant who is appealing from a Bankruptcy Court order, confirming a plan of reorganization, may challenge only those parts of the plan that directly, adversely, and pecuniarily affect the appellant."); *and see Holywell Corp. v. Bank of New York,* 59 B.R. 340, 349 (S.D.Fla.1986).

■ Under these cases only parties adversely affected by provisions of a plan may raise an objection to confirmation based on such provisions, on appeal. Thus, no party may successfully prevent the confirmation of a plan by raising the rights of third parties who do not object to confirmation. Although these cases discuss the question of standing on *appeal,* they are instructive with respect to the question of

standing in a contested confirmation hearing. The doctrine of standing serves to protect the adversarial system which constitutes the cornerstone of American judicial process. Pursuant to this system, courts generally will only hear the arguments of parties who have a direct stake in the consequences of a proceeding. Thus a party who is not directly "aggrieved" by the construction of a provision of the Plan would lack the requisite standing to be heard. Nonetheless, in order to ensure that the interests of all parties in this proceeding have been protected, and because an objection by objection standing evaluation would be wasteful and counterproductive, this court has considered all the objections raised, regardless of the standing of the proponent.

## II The Injunction

The nature of and legal basis for the injunction sought by the Debtor in its Plan of Reorganization has provided the basis for many objections to confirmation. It is concededly a cornerstone of the Plan.

### A. The Provisions of the Injunction

Article IX, ¶ 9.2A(3) of the Plan of Reorganization provides that this court shall "supplement the injunctive provisions of § 524 of the Code, staying, restraining and enjoining all Persons and Governmental Units from taking one or more of the following actions for the purpose of, directly or indirectly, collecting, recovering or receiving payment of, on or with respect to any Claims, Interests or Other Asbestos Obligations [other than those provided for under the Plan]:"

The actions prohibited by this Injunction include: commencing, enforcing, perfecting, or setting-off any proceeding, judgment or interest against the Debtor or its subsidiaries or any settling insurance company, or any of their transferees, or against the Trust.

Article IX, ¶ 9.1 of the Plan states that "It shall be a condition precedent to the confirmation of this plan that on or prior to the confirmation date: (C) The court shall

have entered: (5) an order barring the assertions of punitive damage claims by holders of Class 3 and Class 4 claims or by persons asserting other asbestos obligations."

Thus, the Injunction, effectively channels all asbestos related claims and obligations away from the reorganized entity and targets it towards the AH and PD Trusts for resolution. A feature of that resolution will be the unavailability of punitive damages awarded for the claimants.

### B. The Objections to the Injunction

The Kane Objectors challenge the validity of the injunction as it applies to future claimants as well as the power of this court to issue the injunction and to disallow punitive damage claims. (Future claimants are persons "who have been exposed to asbestos or asbestos products mined, manufactured or supplied by Manville [before the August 26, 1983 chapter 11 petition] and have manifested or will manifest disease post-petition and who are not otherwise represented in these proceedings." Order of August 14, 1984 Appointing Leon Silverman, Esq. Representative for Future Claimants.) The Equity Interests similarly challenge the Injunction as it applies to future claimants on due process grounds.

### C. This Court has the Authority to Issue the Injunction

The Manville reorganization is "one of the most complicated and difficult bankruptcy reorganizations in history...." *In re Johns-Manville Corp.*, 801 F.2d 60, 69 (2d Cir.1986) (Oakes, J., dissenting). Indeed, this case is also one of the most hard fought in reorganization annals. It has been estimated that there have been some 900 applications or motions, over 1000 orders, approximately 55 adversary proceedings, over 40 appeals (not including writs addressed to the U.S. Supreme Court), 300 odd hearings and thousands of pages of court transcripts.

Through it all, this court, this Debtor, and the parties in interest have had to

address societal, legal and economic issues on a scale heretofore unknown to Title 11 proceedings. As regards the presiding over and participation in this case, all parties have been keenly aware that this court sits both as a court of equity and as one charged with fulfilling a legislative mandate. Therefore, this reorganization can only succeed meaningfully if the Plan protects the equitable rights of parties in interest such as the present and future AH claimants as well as the statutory rights of all parties in interest.

■ A bankrupty court sits as a court of equity. As such this court may issue injunctions when necessary to effectuate reorganizations. *Continental Illinois Nat. Bank and Trust Co. v. Chicago, Rock Island and Pacific Ry. Co.*, 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110 (1935). This equitable power has been codified in § 105 of the Code and allows a bankruptcy court to enjoin proceedings in other courts to ensure the efficient administration of an estate, *see In re Johns-Manville Corp.*, 801 F.2d 60, 64 (2d Cir.1986) ("In our view if the Bankruptcy Court may ever use its equitable powers under § 105(a) to enjoin actions pursued in other courts as 'concerning the administration of the estate' under § 157(b)(2)(A), it may exercise that power where there is a basis for concluding that rehabilitation, the very purpose for the bankruptcy proceedings, might be undone by the other action."); *In re Equity Funding Corp. of America*, 396 F.Supp. 1266 (C.D.Cal.1975), *aff'd on other grounds*, 519 F.2d 1274 (9th Cir.1975); *In re Amber Lingerie, Inc.*, 30 B.R. 736, 737 (Bankr.S.D.N.Y.1983).

The effect of this equitable power is not limited to the pendency of a reorganization proceeding. Indeed, bankruptcy courts frequently issue injunctions that limit recourse against the debtor, far beyond the date of confirmation. *see, e.g., In re Abraham*, 421 F.2d 226, 227–28 (5th Cir.1970); *Gotkin v. Korn*, 182 F.2d 380, 382 (D.C.Cir. 1950); *Reconstruction Finance Corp. v. Jacksonville Blow Pipe Company*, 143 F.Supp. 601, 602–03 (N.D.Fla.1956), *aff'd*, 244 F.2d 394 (5th Cir.1957).

Injunctions which permit the sale of assets free and clear of third party interests, for example, typically channel the prosecution of those third party interests against the proceeds of the sale. This power to effectuate sales free and clear was recognized by the Supreme Court over 100 years ago. In *Ray v. Norseworthy*, the Court sanctioned such sales, and the channeling of third party claims, as long as the court rendered "to the parties interested their respective priorities in the proceeds" of the sale. 90 U.S. (23 Wall.) 128, 134 (1874).

Various Code sections, e.g. § 363(f) and (h), explicitly provide for the channeling of claims in this manner. The court's authority to channel claims is, however, by no means limited to such provisions. This authority is "granted by implication", even absent statutory provisions. *Van Huffel v. Harkelrode*, 284 U.S. 225, 227, 52 S.Ct. 115, 116, 76 L.Ed. 256 (1931); *and see Fierman v. Seward National Bank*, 37 F.2d 11, 13 (2d Cir.1930); *see also Farmers Bank v. Julian*, 383 F.2d 314, 322 (8th Cir.1967), *cert. denied*, 389 U.S. 1021, 88 S.Ct. 593, 19 L.Ed.2d 662 (1967); *Rubenstein v. Nourse*, 70 F.2d 482, 484 (8th Cir.1934); *In re Penn Central Transportation Co.*, 383 F.Supp. 1128, 1130 (E.D.Pa.1974).

This channeling authority has been appropriately used to limit the prosecution of a statutory claim against the debtor and to direct that claim to a particular property and the cash fund generated from its sale. *Forde v. Kee-Lox Mfg. Co., Inc.*, 437 F.Supp. 631, 633 (W.D.N.Y.1977), *aff'd*, 584 F.2d 4, (2d Cir.1978); *see also, In re New England Fish Co.*, 19 B.R. 323 (Bankr.W.D.Wash.1982). Furthermore, these channeling injunctions are inherently equitable, and not creatures unique to the bankruptcy courts. *See Texas v. Florida*, 306 U.S. 398, 405–06, 59 S.Ct. 563, 567–68, 83 L.Ed. 817 (1939); *State Farm Fire and Casualty Co. v. Tashire*, 386 U.S. 523, 87 S.Ct. 1199, 18 L.Ed.2d 270 (1967) *and see* Fed.R.Civ.P. 23(b)(1)(B).

■ The analogy to equitable channeling injunctions is quite compelling in this case. The Injunction sought under the Plan will preserve the rights of all asbestos claimants by establishing a corpus of funds from which all can collect. In the absence of the Injunction, the intended beneficiaries of the reorganization will certainly suffer. Furthermore, in the absence of the Injunction, one of the central purposes of Title 11, i.e. preventing the inequitable, piece-meal dismemberment of the debtor's estate, cannot be achieved. Therefore, this court finds that the Injunction contemplated by the Plan is well within its equitable and statutory authority.

### D. The Injunction does not violate due process

The Equity Interests and Kane Objectors have also contended that the Injunction requested under the Plan is unconstitutional in that it would violate the due process rights of future claimants. The Injunction, it is asserted, will unconstitutionally bind future claimants to an impairment of their rights without appropriate notice.

This court has long been aware of the delicate and difficult notice problems inherent in the Debtor's efforts to equitably resolve all of its asbestos-related liabilities. In its decision approving the appointment of the Legal Representative for Future Claimants, in January of 1984, the court noted:

> [T]he problem of sufficient notice of the impact of these proceedings on these putative claimants alluded to by the lower courts in *UNR* and *Amatex*, and raised by some of the movants herein, while difficult in the extreme, is a logistical one which can be handled by resort to innumerable media tools now availabe in our electronically aware society for use by the representative of future claimants.

*In re Johns-Manville Corp.*, 36 B.R. 743, 754–55 n. 6, (Bankr.S.D.N.Y.1984), *aff'd*, 52 B.R. 940 (S.D.N.Y.1985).

Due process, of course, does not and has never, mandated personal, actual notice as the Objectors seem to suggest. The standard announced by the Supreme Court in *Mullane v. Central Hanover Bank and Trust Co.* requires notice "reasonably calculated under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). Indeed, in words that are particularly relevant here, the Court stated, "deprivation of life, liberty or property by adjudication be proceeded by notice and opportunity for hearing *appropriate to the nature of the case."* (Emphasis added) *Id.* at 313, 70 S.Ct. at 656.

■ On August 28, 1986 this court signed an order pursuant to which the Debtor undertook an extensive campaign designed to provide the maximum amount of publicity, with respect to the confirmation process of this Plan, that was reasonable to expect of man and media. That campaign provided, *inter alia,* for national television and radio advertisements, newspaper advertisements in the six leading U.S. and Canadian newspapers and in the largest circulation daily newspaper in each state, the District of Columbia and each Canadian province. This publicity campaign was designed to inform as many future asbestos claimants as possible of the impact of the Manville reorganization upon whatever rights they might have against the Debtor and give them a voice in these proceedings. Such a form of notice clearly meets the standard set forth in *Mullane* where notice by publication is constitutionally adequate "to those beneficiaries whose interests are either conjectural or future." *Mullane,* 339 U.S. at 317, 70 S.Ct. at 659. *See, also, City of New York v. New York, New Haven and Hartford Rail Company,* 344 U.S. 293, 296, 73 S.Ct. 299, 301, 97 L.Ed. 333 (1953).

In the present case, the Legal Representative for Future Claimants has been active in the Manville reorganization for over two years. He has been the catalyst for, if not the architect of this Plan. The Legal Representative was endowed upon his appointment with the full panoply of statutory

rights and duties of representation available to an official committee under the Code. *See, In re Johns-Manville Corp.*, 36 B.R. 743 (Bankr.S.D.N.Y.1984). As this court noted, upon the appointment of the Legal Representative, binding unknown parties in interest to the outcome of judicial procedures in which they have been represented by a trustee, legal representative or guardian *ad litem* acting as a fiduciary for their interests, is not a novel phenomenon in the law. *See, e.g. Hatch v. Riggs*, 361 F.2d 559 (D.C.Cir.1966).

Finally, it is worthwhile to remember who due process will serve in this reorganization. The goal of the Plan and the purpose of the Injunction is to preserve the rights and remedies of those parties, who by an accident of their disease cannot even speak in their own interest. The impracticable, if not impossible version of due process envisioned by the Objectors would effectively destroy these rights and remedies. Theories and standards of "due process" are nothing more than the human effort to make the inchoate notions of justice and equity real and tangible to parties who stand before a court of law. The Objectors' "due process", which would deny asbestos victims justice and equity, is not a "due process" at all.

**E. This court may enjoin the award of punitive damages**

The Kane Objectors also contend that the Injunction is flawed in that it would prohibit the recovery of punitive damages by asbestos victims. To allow recovery of punitive damages, of course, would be to risk the depletion of Trust assets to the benefit of known victims at the expense of future claimants. Such a result is inequitable on its face.

The purpose of punitive damages, furthermore, is to punish tortfeasors and deter them from their wrongful conduct. *See, e.g., Williams v. City of New York*, 508 F.2d 356 (2d Cir.1974); *Sibley v. K.L.M. Royal Dutch Airlines*, 454 F.Supp. 425 (S.D.N.Y.1978). Neither purpose would be served by permitting the recovery of punitive damages in this reorganization. Punitive damages under the Plan would be recovered from the Trust. The Trust is not, by any stretch of the imagination, a target to be deterred from wrongful conduct. As noted above, recovery of punitive damages will deplete the Trust at the expense of future victims. These future victims are not merely innocent parties, but rather injured parties who are inexorably backing into the present as their dreaded asbestos diseases manifest themselves. Punitive damages in this context would visit a hardship on this group for wrongs attributable to others. Therefore the policy to be advanced by permitting such damages would not be furthered in this reorganization. *See, e.g., Sanford v. Celotex Corp.*, 598 F.Supp. 529, 530–31 (E.D.Tenn. 1984) ("[T]he unique nature of asbestos litigation necessitates care not to exhaust in a limited number of large punitive damage awards funds needed for possible compensatory awards in multiple asbestos lawsuits.").

Finally, it should be observed that arguably under § 510 of the Code, bankruptcy courts have the *statutory* power to subordinate claims for punitive damages. Bankruptcy courts have certainly exercised their inherent equitable authority to subordinate and to disallow punitive damage claims. "The idea is that to allow a claim for punitive damages in these circumstances would make innocent creditors bear the burden of the debtor's wrongdoing." *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 786 F.2d 794, 797 (7th Cir. 1986); *and see, In re GAC Corp.*, 681 F.2d 1295, 1301 (11th Cir.1982) ("We agree with the bankruptcy judge that the effect of allowing a punitive damages claim would be to force innocent creditors to pay for the bankrupt's wrongdoing. Such a result would be inequitable, and the punitive damages claim was properly stricken.") Thus, whether or not punitive damages are recoverable in bankruptcy, it is well within the authority of this court to disallow a claim for punitive damages, in the circumstances of this case, where allowing such a claim

would ill serve the policy of such awards. *See In re Colin,* 44 B.R. 806 (Bankr.S.D.N. Y.1984). Indeed, it is well within the equitable power granted by § 105 of the Code to preclude, by means of the Injunction, recovery of punitive damages in this reorganization.

## III The Status of the Future Claimants

Several objections to confirmation revolve around the status of future asbestos victims and their claims in this reorganization. From the outset, it should be noted that in a very real sense, both from the point of view of the Debtor and from that of the asbestos victims, a distinction between "present" and "future" victims is, at best, nominal. The Trust does not make this nominal distinction and is designed to satisfy the claims of all victims, whenever their disease manifests.

The future claimants are parties in interest, as defined by the Code, § 1109. *In re Johns-Manville Corp.,* 36 B.R. at 746; *and see, In re Amatex Corp.,* 755 F.2d 1034, 1041 (3rd Cir.1985) ("Whether or not future claimants have claims in the technical bankruptcy sense that can be affected by a reorganization plan, such individuals clearly have a practical stake in the outcome of the proceedings."); *accord, In re UNR Industries, Inc.,* 725 F.2d 1111 (7th Cir.1984).

Whether these parties in interest have claims that are cognizable in a reorganization proceeding, however, is not an issue which needs to be determined in order to confirm this Plan. Instead, the Plan treats the claims as "other asbestos obligations" ("OAO"), to be funneled into the same claims handling facility which administers the claims of present asbestos victims. OAO's will not be discharged upon confirmation. Instead they will be subject to the Injunction.

Although the definition of "claim" in § 101(4) of the Code is meant to be construed liberally, *see In re Johns-Manville Corp.,* 57 B.R. 680 (Bankr.S.D.N.Y.1986); *In re Robinson,* 776 F.2d 30, 35 (2d Cir. 1985), *rev'd on other grounds,* — U.S. —, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986) (Reviewing the relevant case law on the definition of claim, the court noted the following characterizations: "broad", "very broad", "extremely broad", "could not be broader", "broadest possible", "all-encompassing", "sufficiently broad to cover any possible obligation"), two recent Third Circuit cases have, nevertheless, adopted a more limited construction of the term. *Schweitzer v. Consolidated Rail Corp.,* 758 F.2d 936 (3d Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985); *In re M. Frenville Co., Inc.,* 744 F.2d 332 (3d Cir.1984), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985).

Under *Schweitzer,* the determination of whether a claim exists turns on relevant state or federal non-bankruptcy law. Thus, in an Act case, where the Federal Employee Liability Act applied, a plaintiff exposed to asbestos prior to confirmation, but who did not manifest an asbestos-related disease until after confirmation, did not have a claim dischargeable upon confirmation. Similarly, in *Frenville,* where a cause of action did not arise until after the filing of a petition, although the underlying acts occurred pre-petition, the plaintiff was held not to have a claim dischargeable in bankruptcy.

It should be noted, however, that both *Schweitzer* and *Frenville* explicitly questioned the applicability of their holdings as they might apply in cases similar to the one before this court. The *Frenville* court commented:

"If there were some overriding federal policy, we might have the power to develop federal law. *See, In re Beck Indus., Inc.,* 725 F.2d 880, 891 (2d Cir.1984); *In re Johns-Manville Corp.,* 36 B.R. 743, 751 n. 4 (Bankr.S.D.N.Y), *appeal denied,* 39 B.R. 234 (S.D.N.Y.1984). A bankruptcy proceeding stemming from a mass tort—such as exposure to asbestos—may be a case in which the application of federal law is indicated."

744 F.2d 332, 337 n. 8 (3d Cir.1984); *and see, Schweitzer,* 758 F.2d at 944, n. 1.

Other courts confronted with the issue of future claims have contemplated a more inclusive definition of claim. The Seventh Circuit, in *UNR, supra*, for example stated that:

A bankruptcy court's equitable powers . . . just might be broad enough to enable the court to make provision for future asbestosis claims against the bankrupt when it approved the final plan of reorganization. . . . Could it not be argued therefore that a bankruptcy court can and should use its equitable powers, which traditionally "have been invoked to the end that . . . substance will not give way to form, that technical considerations will not prevent substantial justice from being done," . . . to prevent the liquidation or discharge of the bankrupt before provision is made for such persons?

725 F.2d at 1119 (citations omitted).

The court in *In re A.H. Robins Co, Inc.*, similarly was reluctant to adopt a *Frenville* construction where such construction would disadvantage future claimants.

If federal law were not created in this case, Robins could be subject to an ongoing battle with Dalkon Shield cases and would have to defend piece-meal litigation, which technically, if allowed, could be interpreted to fall outside the reorganization umbrella. This is just the type of chaos the drafters of the Code sought to avoid when they abandoned the concept of "provability" and "allowability" which was rooted in [the] old Act, and adopted, in its place, the more broad, and liberal definition of the term "claim" as presently found in the Code.

63 B.R. 986, 992 (Bankr.E.D.Va.1986).

The court in *In re Baldwin United Corp.*, was similarly critical of the *Frenville* decision.

While the third-party cause of action of the accounting firm in *Frenville* may not have arisen under New York state law until *after* the petition was filed, its claim for bankruptcy purposes arose *before* the petition was filed. This is so because a "right to payment" under the

definition of "claim" includes obligations which are neither matured, nor liquidated, nor fixed. 11 U.S.C. § 101(4)(A). 48 B.R. 901, 903 (Bankr.S.D.Ohio 1985). *See also, In re Edge*, 60 B.R. 690, 704 (Bankr.M.D.Tenn.1986) *and In re Johns-Manville*, 57 B.R. 680, 689 (Bankr.S.D.N.Y. 1986) ("It [the *Frenville* analysis] creates an artificial and arbitrary classification system by which the timing of a third-party lawsuit against the claimant determines not only the priority of distribution on a claim but also the dischargeability of the claim.")

Thus, were this court compelled to decide whether to distinguish between victims solely on the fortuitous basis of the time of manifestation of their diseases, this latter authority would, indeed, be an imperative. As noted before, however, there is no need to reach this issue.

## IV Standards for Confirmation Under § 1129

Courts may confirm a plan under § 1129, only if all the requirements of this section are met. One of the requirements of § 1129(a) is that each class of claims or interests either accept the plan or not be impaired by the plan. If, as in the present case, an impaired class does not accept the plan, the plan may still be confirmed pursuant to § 1129(b) ("cram down"). The plan, however, must also comply with all other provisions of § 1129(a).

### A. Standards for Confirmation Under § 1129(a)

§ 1129(a) provides that "the court shall confirm a plan only if all of the following requirements are met":

*(1) "the plan complies with the applicable provisions of this title".*

Objections to confirmation raised under § 1129(a)(1) generally involve the failure of a plan to conform to the requirements of § 1122(a) or § 1123. § 1122(a) provides for the appropriate classification of claims. In the present case, claims against the Debtor are appropriately classified and no objec-

tions to their classification have been raised.

§ 1123(a) additionally provides that a plan must (1) designate the classes of claims against the debtor. Classes of claims and interests are appropriately designated in Article II of the Debtor's Plan, pursuant to this requirement. § 1123(a)(2) provides that the plan of reorganization must specify classes which are unimpaired under the plan. Classes 1, 2 and 5 are appropriately designated as unimpaired in Article III of the Debtor's Plan, pursuant to this requirement. § 1123(a)(3) provides that treatment of impaired classes must be described in the plan. Article III of the Debtor's Plan also, appropriately describes the treatment of impaired classes, pursuant to this requirement. § 1123(a)(4) provides that all members of a particular class must be treated equally, unless a given member consents to less favorable treatment of his or her claim or interest. The Debtor's Plan, pursuant to this requirement provides for the equal treatment of each member of each particular class.

§ 1123(a)(5) requires that a plan provide adequate means for that plan's implementation. Article V of the Debtor's Plan satisfies this requirement. § 1123(a)(6) prohibits the issuance of non-voting equity securities by the reorganized debtor and ensures the appropriate distribution of voting power among the various classes of security interests. Paragraph 11.2 of Article XI of the Debtor's Plan provides for compliance with this requirement. § 1123(a)(7) provides that the method for appointing officers, directors or trustees under the plan comply with the interests of creditors, equity security holders and with public policy. The methods of appointment set forth in the Debtor's Plan comport with these requirements. Thus the Plan is acceptably structured under § 1122 and § 1123 and pass muster for the purposes of the § 1129(a)(1) requirement.

*(2) "The proponent of the plan complies with the applicable provisions of this title."*

Objections to confirmation raised under § 1129(a)(2) generally involve the alleged failure of the plan proponent to comply with § 1125 and § 1126 of the Code. *See, In re Butler,* 42 B.R. 777 (Bankr.E.D.Ark. 1984); *In re Toy & Sports Warehouse,* 37 B.R. 141, 149 (Bankr.S.D.N.Y.1984). These sections provide for the appropriate manner of disclosure and solicitation of plan votes. In the present case, the Equity Interests have alleged that the Debtor's Disclosure Statement was misleading, in that it failed to apprise creditors and security holders that the Second Circuit reversed and remanded this court's decision of August 1985 enjoining the calling of a shareholder's meeting. The Kane Objectors allege that the Debtor's Disclosure Statement was misleading in that it failed to adequately inform creditors and shareholders of a) alleged legal infirmities with respect to the Injunction; b) the number of claims to be satisfied from the AH Trust; c) the alleged legal infirmity of plan provisions providing for payments to future claimants; and d) the alleged legal infirmities of the special voting procedures adopted for AH claimants.

 Contrary to the objections of the Equity Interests, the Disclosure Statement was not flawed by its failure to report the decision of the Second Circuit reversing and remanding for further proceedings the August 1985 decision of this court that enjoined the call of a meeting of the Debtor's shareholders. This court approved the Disclosure Statement on August 28, 1986. The Second Circuit's non-finally dispositive decision issued on September 10, 1986, after the Plan and Disclosure Statement had been disseminated and the voting process begun. Failure to report the Second Circuit's decision did not prejudice the interest of any party involved in these proceedings. On remand, this court, following an exhaustive hearing, decided, on October 28, 1986, to enjoin the efforts to call a shareholders meeting. No suggestion has been made that this too is a disclosure event. Furthermore, the standard implicit in the objection of the Equity Interests would have been impossible for any plan propo-

nent to meet, in light of the sheer volume of appellate activity generated by these same Interests subsequent to the approval of the Disclosure Statement. The Code simply does not require disclosure of every interlocutory or non-final decision in a case to meet the standards of § 1125. It was never intended that a disclosure statement be a daily, weekly or periodical litigation newsletter.

■ As discussed, the Kane Group's objection to the Disclosure Statement for its alleged failure to adequately describe the legal infirmities of the Injunction is without merit. The Debtor's Disclosure Statement adequately describes the parameters and legal sufficiency of the injunction. Similarly the objections of the Kane Group based upon the alleged failure of the Disclosure Statement to adequately describe the impropriety of payments to future claimants under the Plan, are without merit. The status of the future claimants in this case has already been discussed.

■ The Kane Objectors' challenge to the disclosure statement, based on its description of the number of claims to be paid by the AH Trust must also fail. No estimation as to the number of claimants or amount of claims to be paid can be made with absolute certainty. The debtor can only be required to make estimates which are reasonable. The evidence presented has adequately demonstrated the reasonableness of these estimates. Testimony established a floor of at least 50,000 in number of present claimants. They have become identifiable through the confirmation process. Furthermore, a $26,000 per claim disposition value estimate is amply supported by the empirical data relied upon. No rebuttal evidence was offered to cast doubt on these assumptions.

■ The Kane Objectors also challenge the legal adequacy of the voting procedures adopted for the AH claimants. On June 23, 1986 this court entered an order fixing, for the purposes of voting, the amount of each AH claim at one dollar. Acceptance by the AH class was condi-

tioned upon acceptance by not less than ⅔ in number of the holders of such claims who voted on the Plan. Over 50,000 AH claimants voted, and with 3,000 ballots yet to be counted, *approximately 95%* of this class has accepted the Plan.

The basis of the Kane Objectors to this voting procedure is that it does not rigidly comply with §§ 501, 502 and 1126 of the Code. These objections ignore both the realities of this case, and the equities which need to be addressed thereunder. Furthermore, Fed.R.Bankr.P. 3018, specifically and elastically provides that a court may, for the purposes of voting, temporarily allow a claim or interest "in an amount which the court deems proper". The effect of the voting procedures adopted for AH claimants in this case has been to enfranchise the greatest possible number of asbestos health victims. The unstated goal of the Kane Objectors, on the other hand, would seem to be to silence the vast majority of those parties in interest who are the central concern of this reorganization and who apparently do not share the Objectors' negative view of the Plan solutions.

It has been the stated goal of this court and of the parties in interest throughout these proceedings to ensure the protection and participation of the interests of the asbestos health victims, *see e.g., In re Johns-Manville Corp.,* 66 B.R. 517, 522 (Bankr.S.D.N.Y.1986). The construct of the voting procedure is proper as it clearly meets the desideratum of expanded suffrage and participation in the reorganization by all parties in interest.

*(3) "The Plan has been proposed in good faith and not by any means forbidden by law."*

In considering whether a plan has been filed in good faith a court must determine "in light of the particular facts and circumstances, whether the plan will fairly achieve a result consistent with the Bankruptcy Code." *In re Madison Hotel Associates,* 749 F.2d 410, 425 (7th Cir.1984). The Second Circuit has defined the good faith standard in the bankruptcy context "as requiring a showing that the plan was

proposed with 'honesty and good intentions' and with 'a basis for expecting that a reorganization can be effected'." *In re Koelbl*, 751 F.2d 137, 139 (2d Cir.1984).

The Equity Interests have alleged that the Debtor has acted in bad faith in negotiating the Plan, and that, therefore, the Plan cannot satisfy this requirement of the Code. This court, however, recently held to the contrary. The court, indeed, found that the parties in interest negotiated with Equity Interests in good faith, and that any failure of the negotiations from Equity's point of view was properly attributed to Equity's refusal to negotiate from the Plan. *In re Johns-Manville Corp.*, 66 B.R. 517, 531–32, 540–41 (Bankr.S.D.N.Y. 1986), *aff'd mem.*, (S.D.N.Y. December 9, 1986).

The Kane Objectors contend that the Plan was proposed in bad faith, in that the Debtor sought, by its chapter 11 filing, to orchestrate nationwide asbestos-related litigation. The argument is bereft of merit. This court has already passed upon the reasons for and propriety of the Debtor's chapter 11 filing. *In re Johns-Manville Corp.*, 36 B.R. 727 (Bankr.S.D.N.Y.1984), *appeal denied*, 39 B.R. 234 (S.D.N.Y.1984), *reh'g denied*, 39 B.R. 998 (S.D.N.Y.1984), *mandamus denied*, 749 F.2d 3 (2d Cir. 1985). Johns-Manville was and remains "a financially besieged enterprise in desperate need of reorganization of its crushing real debt, both present and future." *Id* at 741.

*(4) "Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable."*

The evidence establishes that all relevant payments contemplated by this section have been or will be made subject to the approval of this court.

■ The Equity Interests and Mr. MacLean would read this section to require this court to pass on fees, paid to attorneys representing asbestos health claimants, by their clients. These objectors, however, have cited no authority, which even by analogy, would support their interpretation of § 1129(a)(4). Furthermore, in connection with a contested matter, this court has already ruled that fee arrangements between AH claimants and their attorneys lie beyond the jurisdiction of the court:

[T]he reasonableness of the contingency fee arrangement between individual creditors and their counsel does not affect the particular parties before me today [The Equity and Commercial Creditors Committees]. The Equity Committee may have and the Commercial Committee may have a legitimate opinion or opinions as to the general appropriateness of contingent fees, but they have no clear financial stake in the individual contracts that they question.

Transcript of Hearing on Motion for Court Review of Contingent Fees of Counsel for Asbestos Personal Injury Claimants, February 25, 1986, p. 76; *and see, Brown v. Watkins Motor Lines, Inc.*, 596 F.2d 129 (5th Cir.1979).

The objectors here seek to raise a putative controversy between third parties, the merits of which may very well be subject to judicial determination at a later time and place, but which does not effect the administration of the Debtor's estate. The fee arrangement between a claimant and his or her attorney is immaterial to these reorganization proceedings. As such, these objections raise collateral disputes which this court is not empowered to rule upon. *See In re Paso Del Norte Oil Co.*, 755 F.2d 421 (5th Cir.1985), *In re Shirley Duke Associates*, 611 F.2d 15 (2d Cir.1979), *First State Bank & Trust Co. v. Sand Springs State Bank of Oklahoma*, 528 F.2d 350 (10th Cir.1976). Nothing stated herein should be construed as expressing approval or disapproval of individual contingent fee arrangements reached in a non-bankruptcy setting.

*(5) Identities, affiliations and compensation of individuals proposed to serve as officers and directors of the debtors and*

individuals proposed to serve as trustees of the AH Trust and the Property Damage Trust have been disclosed and such appointments are consistent with the interests of creditors, equity security holders and public policy.

The Debtor has made detailed disclosures, pursuant to § 1129(a)(5) both in its Disclosure Statement and at the Hearing on Substantive Consolidation, December 9, 1986. The court also notes that no objections to confirmation have been raised under this section.

(6) "Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval."

Because the Debtor is a widely diversified international company, the usual declaration of "non applicability of this section" was insufficient. In the instant case, witness testimony demonstrated that the Debtor is not subject to any regulatory rate governance commission.

§ 1129(a)(7) reads in relevant part "With respect to each impaired class of claims or interests—each holder of a claim or interest of such class—(i) has accepted the plan or (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date."

In the present case, acceptance of the plan by impaired classes has not been unanimous. The Debtor's Plan, therefore, must provide each holder of a claim or interest with an amount equal to or greater than the amount he or she would receive under chapter 7, in order to comply with this section of the Code. The Property Damage Claimants, AH Claimants, Unsecured Creditors, Preferred Shareholders and Common Shareholders are all impaired classes under the Debtor's Plan. The

Debtor has presented convincing evidence both in its Disclosure Statement and at this hearing, establishing that each member of these impaired classes will receive more under this Plan, than they would upon liquidation of the Debtor.

As demonstrated by the Debtor's Liquidation Analysis, Exhibit 3, which was testified to by Mr. Thomas Stevens, President and Chief Executive Officer of the Manville Corporation, Transcript of Confirmation Hearing dated December 16, 1986 ("Tr."), p. 94 et seq, and by the Debtor's Value of Distribution to Classes 6 and 7, Exhibit 9, testified to by Mr. Byron Rose, Managing Director of Morgan Stanley, the Debtor's investment bankers, Tr. p. 190 et seq., upon liquidation, each class of impaired claims or interests treated in this Plan would receive less than what the Plan itself provides for.

The Liquidation Value, Exhibit 6, testified to by Mr. Rose, Tr. 159, describes the assumptions and estimations made by the Debtor and its investment bankers in arriving at a liquidation value for the Manville corporation. This analysis assumed: 1) that the Debtor's businesses would be sold on a going concern basis; 2) that some sort of Injunction would protect the transferee entity; and that 3) the gross operating value of the business sold would suffer a 25% discount in the transaction. This discount reflects the risk perceived by the market in the Debtors asbestos and environmental liabilities and the loss in value associated with a forced sale. The court finds these assumptions to be quite reasonable.

Class 3, the Property Damage Claimants are considered to have an allowed claim of $125 million (based upon a negotiated compromise of more than $80 billion in filed claims and a willingness to subordinate that interest to the AH victims). Upon liquidation, these claimants would receive between 56% and 81% of their allowed claims. The Plan provides for 100% of their claims. Tr. p. 110.

Class 4, the present Asbestos Health claimants have between $1.3 and $1.5 bil-

lion dollars in allowed claims. Upon liquidation, these claimants would again receive between 56% and 81% of their allowed claims. The Plan provides for 100% of their claims. Tr. p. 110.

Class 6, the General Unsecured Creditors, have an allowed claim of $472.5 million. They, too would receive between 56% and 81% of their claims on liquidation. The Plan provides for 100% of their claims. Tr. p. 110. Unlike the claimants in Classes 3 and 4, who will receive cash under the Plan, Class 6 claimants will receive a combination of cash and notes in payment of their claims. This package is reasonably estimated to equal 100% of their claims. Class 6 will also receive a package of securities valued between $84 and $126.1 million in lieu of post-petition interest. Tr. p. 191 *et seq.* This payment will be discussed more fully hereafter.

Class 7, Preferred Shareholders, have allowed claims (liquidating preference) of $413 million. Upon liquidation, members of this class would receive nothing for their interests. Under the Plan, Preferred Shareholders will receive a package of securities with an estimated trading value of $79 to $94 million. Tr. p. 110. The value of this package, as the value of the securities package received by Class 6 claimants, is of course a function of the trading price of the reorganized corporation's securities. The actual payment received by these classes, under the Plan, therefore, may fluctuate. Tr. p. 188. The court finds that the range of value estimated by the Debtor is reasonable.

Class 8, the common shareholders, do not have an allowed claim. Upon liquidation, the members of this class would receive nothing. As will be discussed hereafter the Debtor is insolvent and therefore there is no residual value remaining for Equity. Under the Plan, however, Equity will retain a share of the reorganized corporation the value of which the Debtor estimates at $15 to $18 million dollars. Tr. p. 110.

The Equity Interests have challenged the Debtor's liquidation analysis on the ground that it improperly includes payments to future claimants. As will be shown, this contention is unfounded.

*(8) "With respect to each class of claims or interests—(A) such class has accepted the plan or (B) such class is not impaired under the plan."*

In the present case, only one impaired class, the common equity holders, has not accepted the Plan. The Debtor, therefore, can only confirm its Plan of Reorganization if it meets the requirements of § 1129(b) as well as those of § 1129(a). The § 1129(b) requirements will be discussed hereafter. The Kane Objectors have suggested that the acceptance voted by the AH Claimants is invalid in light of the voting procedures adopted for that class. As previously discussed, this objection is without merit.

*§ 1129(a)(9) provides for the appropriate treatment of various priority claims arising under § 507.*

The Debtor has established by convincing evidence that this provision has been satisfied. Furthermore, no objection to confirmation has been raised under this section.

*(10) "If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider."*

As previously noted, all impaired classes, with the exception of the common equity shareholders have accepted the Debtor's Plan. The provisions of this section have, therefore, been complied with.

*(11) "Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."*

The Debtor has established by convincing evidence the feasibility of this Plan. Indeed, the troubled history of the Manville reorganization suggests that this Plan is the *most* feasible plan of reorganization

that any party in interest could propose. *See, e.g., In re Johns-Manville Corp.,* 66 B.R. 517 (Bankr.S.D.N.Y.1986), *aff'd mem.,* (S.D.N.Y. December 9, 1986).

■ A Bankruptcy Court, in determining the feasibility of a proposed plan of reorganization should "scrutinize the plan carefully to determine whether it offers a reasonable prospect of success and is workable." *In re Monnier Brothers,* 755 F.2d 1336, 1341 (8th Cir.1985). The plan proponent is not required to *guarantee* the ultimate success of the reorganized company. *Id; In re Wolf,* 61 B.R. 1010, 1011 (Bankr. N.D.Iowa 1986). Rather, the plan proponent is only required to provide a "reasonable assurance of success". *In re Trail's End Lodge, Inc.,* 54 B.R. 898, 904 (Bankr. D.Vt.1985).

Manville has demonstrated at this hearing that it will, upon confirmation, be able to meet its cash distribution obligations under the Plan. Furthermore, the Debtor's reasonable and credible projections of future earnings have established that the reorganized corporation is unlikely to face future proceedings under this title.

As demonstrated in its Feasibility Analysis, Ex. 4, p. 18–19, and testified to by Mr. Stevens, Tr. p. 113 *et seq.,* Manville will generate enough cash to meet its Plan obligations and operating cash requirements, from its own operations and from a pending credit facility over the next five years. Tr. p. 130–36. The court is satisfied that the assumptions and estimations underlying this analysis are well founded. Similarly the projected balance sheets and cash flow statements presented by the Debtor, Ex. 4, p. 18–21, testified to by Mr. Stevens, Tr. p. 130 *et seq.* reveal a corporation which this court can be "reasonably assured" will succeed in its business environment for the foreseeable future and which is unlikely to face reorganization or liquidation in that time period. Seasoned, experienced, operating management remain with this Fortune 500 company to provide a measure of additional post-confirmation stability.

The Kane Objectors and Equity Interests have contended that the present Plan is not feasible by again asserting a perceived legal infirmity grounded upon the accommodations made for future claimants. This contention is not well founded, as has been demonstrated. The Armstrong and Kane Objectors have challenged the feasibility of the Plan on the ground that the AH Trust will be unable to satisfy present and future AH claims. The evidence submitted by the Debtor as previously noted, provides a reasonable estimation, based upon known present claimants and reasonable extrapolations from past experience and epidemiological data, of the number and amount of asbestos-related claims that the AH Trust will be required to satisfy. The Debtor has also established that the Trust will, in fact, meet this burden. As has been shown, objections based on the status of future claimants and the dischargeability of their claims in this reorganization are not a relevant issue in this confirmation proceeding.

The Armstrong Objectors have questioned the feasibility of the Debtor's Plan on the ground that Plan provisions which allegedly preclude the Trust from joining an industry wide claims handling facility, *i.e.* the Wellington Facility, will result in the rapid depletion of Trust assets to the detriment of Trust beneficiaries. The Plan, however, clearly provides that the trustees, in accordance with their fiduciary obligations, may merge the Trust with another claims handling facility. The Armstrong objection is unsupported by factual data to demonstrate compatibility of the Trust facility with the Wellington facility or how a fruitful synergism would result by merger. Counsel for the objectant candidly admitted that the existence of separate facilities could affect Wellington settlements. These competitive concerns do not remotely affect feasibility.

Therefore, based on these findings, this court concludes, that with the exception of the provision of § 1129(a)(8) all requirements of § 1129(a) have been satisfied.

B. Standards for Confirmation Under § 1129(b)

§ 1129(b) of the Code provides that "Notwithstanding section 510(a) of this title, if

all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph.

*(1) "If the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."*

As noted previously, Classes 1, 2 and 5 are not impaired by the Debtor's Plan. Classes 3, 4, 6, 7, 8 and 9 are impaired under the Plan. Class 8, the common shareholders, is the only class which voted to reject the Plan.

■ The language and legislative history of the statute provides little guidance in applying the "unfair discrimination" standard of § 1129(b)(1). Generally speaking, this standard ensures that a dissenting class will receive relative value equal to the value given to all other similarly situated classes. Weintraub and Resnick, *Bankruptcy Law Manual*, ¶ 8.23[3] at p. 8–109–110 (revised ed. 1986); Klee, "All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code," 53 Am.Bankr. L.J. 133, 142 (1979). Thus a plan proponent may not segregate two similar claims or groups of claims into separate classes and provide disparate treatment for those classes. *See, e.g. In re Pine Lake Village Apartment Co.*, 19 B.R. 819 (Bankr.S.D.N.Y.1982); *compare In re Jartran, Inc.*, 44 B.R. 331 (Bankr.N.D.Ill.1984) (no unfair discrimination where separate classes receiving disparate treatment do not have comparable claims.)

■ In the present case, the interests of the Class 8 common shareholders are not similar or comparable to those of any other class. Thus, this court finds no unfair discrimination.

*The applicable portion of § 1129(b)(2) provides: "For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class in-*cludes the following requirements: (C) With respect to a class of interests:"

*(i) "the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest;"*

■ It should be noted that § 1129(b)(2)(C), by it terms, is not exclusive. Indeed a court may and should take additional factors into consideration in determining whether a plan is fair and equitable with respect to a dissenting class. *See, e.g., In re Jones*, 32 B.R. 951, 960 n. 14 (Bankr.D.Utah 1983) (" 'Fair and equitable' is a term of art which carries with it decades of judicial interpretation.... Congress clearly intended to transfer some of the judicial gloss placed on the fair and equitable test under former law into the fair and equitable test under § 1129(b). 124 Cong.Rec.H. 11,103 (September 28, 1978); S. 17,420 (October 6, 1978).")

■ A valuation of the debtor's business is, by virtue of the statutory language, almost a prerequisite to a determination that a plan satisfies the fair and equitable test of § 1129(b). Manville has clearly established, by credible evidence, that its debt exceeds even the best estimate of its "going concern" value. As a result, the post confirmation value of Equity's interest is zero.

Manville has reasonably estimated the gross value of its operating business to be between $1.6 and $2.0 billion dollars, on a discounted cash flow basis. *See,* Exhibit 6 *and* testimony of Mr. Rose, Tr. 159 *et seq.* This value was discounted to reflect the market's perception of the corporation's environmental and asbestos liabilities. As reflected in the Market Value Adjusted Balance Sheet, Ex. 7, testified to by Mr. Rose, Tr. 174 *et seq.,* the value of the assets of the corporation in chapter 11 are signifi-

cantly exceeded by its liabilities, currently estimated to range between $2.6 and $4.2 billion dollars. As a result, the common equity residual value ranges between *negative* $2.2 billion and *negative* $331 million. Tr. p. 182–83. The corporation is insolvent.

As has been fully explained, this court need not determine whether future asbestos-related liability is more appropriately treated as a current debt of the estate or as a liability of the post confirmation entity. It is beyond peradventure that there will be future claimants with rights to payment for their asbestos-related injuries. As the Debtor has established, whether those payments come from the Debtor's estate or from the post-confirmation entity, future asbestos-related liability has a significant impact on the Debtor's liquidation and going concern valuation. Assuming *arguendo*, that these rights to payments are "claims", as defined by the Bankruptcy Code, they would constitute a portion of Manville's plan debt, to be subtracted from the Debtor's going concern value. The result would be no value left for equity. Alternatively, if these rights to payment are not "claims" as defined by the Code, and they are obligations that the reorganized Debtor will be required to satisfy, the going concern value of the reorganized Debtor would suffer a concomitant decrease in value. Under either scenario, the value available to Equity is zero.

Finally, the Kane Objectors and Equity Interests assert that the provisions of the Plan that give effect to the settlement of Class 6 claims reached between the Debtor, Unsecured Creditors and every consenting constituency, violate the fair and equitable requirements of § 1129(b). Under this settlement Class 6 members will receive approximately 50% of their allowed claims on confirmation, and notes representing the remainder of their claims, payable some years after confirmation. Class 6 claimants, under this agreement, will also receive a package of securities in the reorganized corporation in lieu of post-petition interest on their claims. This package has an estimated market value substantially less than the calculable post-petition interest on their claims.

The Equity Interests contend that Class 6 claimants may not receive post-petition interest on their claims, under § 502(b)(2) and § 506(b). Furthermore, Equity argues, that to the extent that Class 6 creditors are receiving property in lieu of post-petition interest, they are receiving property which otherwise would inure to the benefit of common shareholders.

 Nowhere does the Code prohibit payment of post-petition interest under a plan in a chapter 11 reorganization. The Equity Interests' reliance on §§ 502 and 506, moreover, is misplaced. Equity apparently understands § 506 to provide the *sole* circumstances in which a creditor may receive post-petition interest under the Code. The genius of the Bankruptcy Code lies in its breadth and flexibility. This court is more than reluctant to read exclusivity into a particular section of a statute, where such exclusivity is not explicitly provided for, and such a reading does not comport with the spirit of the statutory scheme.

Furthermore, this court fails to see the relevance of § 502 to Equity's objection. § 502 is a provision which addresses the allowability of contested claims. Under § 502(b)(2), a bankruptcy court must disallow that portion of a disputed claim which represents post-petition interest, after a hearing on the contested matter. The Plan provisions which provide property in lieu of post-petition interest, in contrast, represent a settlement of the claims of unsecured creditors reached among the parties. (The $472 million figure is a negotiated assumption.) The Class 6 agreement is simply not a contested matter under § 502. Indeed, the more appropriate analogy would be to Fed.R.Bankr.P. 9019, which authorizes a bankruptcy court to approve compromises and settlements.

In any event, even were Equity's reliance on these inapplicable code sections justified, the property paid in lieu of post-petition interest, would never inure to the benefit of common shareholders. At the very least, this property would be consumed in

satisfying the claims of preferred shareholders, a class superior on the ladder of "absolute priorities" to common equity. *see, In re Evans Products Co.,* 65 B.R. 870, 875 (S.D.Fla.1986) ("Appellants [the shareholders committee and the debtors, objecting to the confirmation of a creditor's plan] argue that the Grossman Guarantee claim is worth $61.3 million rather than the $86.4 million claimed by the Lenders [the plan proponents]. If true, the Lenders would receive more than 100% of their claim. This would violate the 'fair and equitable' requirement of § 1129(b)(1). The Appellants again have no standing to raise this issue because the amount the Lenders are to receive under the Grossman Guarantee claim is an accommodation made among the creditors. Only the creditors rights *vis-a-vis* each other would be affected—Appellants inability to participate would not be changed under the absolute priority rule....")

The Kane Objectors also contend that the provisions of the Plan whereby Class 6 creditors receive property in lieu of post-petition interest violate § 1129(b) and § 1129(a)(7) of the Code. The latter section requires that dissenting members of an impaired class receive "at least the value their claim would have received upon the debtor's liquidation." As noted above, the liquidation value of Class 4 claims is significantly less than the full value of their claims that they will receive under this Plan.

There is serious doubt as to the appropriateness of measuring the treatment of Class 4 claims under the fair and equitable standards of § 1129(b). Under § 1129(b)(1), a "cram down" may be effected "if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under *and* has not accepted, the Plan." 11 U.S.C. 1129(b)(1) (emphasis added). While Class 4 is impaired under this Plan, it has also voted overwhelmingly to accept the Plan. As noted in this section's legislative history: "It must be emphasized that the fair and equitable requirement applies *only to dissent-*

*ing classes.* Therefore, unlike the fair and equitable rule contained in Chapter X and § 77 of the Bankruptcy Act, under § 1129(b)(2) senior accepting classes are permitted to give up value to junior classes as long as no dissenting, intervening class receives less than the amount of its claim in full." 124 Cong.Rec. S17420 (daily ed. Oct. 6, 1978) (Remarks of Sen DeConcini) (emphasis added).

The agreement reached between Class 6 creditors and the other constituencies seems well within the contemplation of the Code. Here, all impaired classes senior to the unsecured creditors mutually agreed to a distribution of value available to creditors. In the words of the legislative history, they consented to "give up" value to which they had a right, in order to achieve a consensual plan.

Finally, it should be noted, that those asbestos health victims who have claims which are truly comparable to Class 6 claimants, i.e. liquidated, will receive postpetition interest on their claims, where permitted under applicable state law, under the Plan. Tr. p. 273–74.

V Conclusion

█ In conclusion, Manville has established by convincing evidence, that the Plan is fair and equitable in accordance with the requirements of § 1129(b). The Debtor is insolvent and no value remains for common equity. No class of interests junior to common equity shall receive property of the estate. Distribution under the Plan to classes senior to common equity is exceeded by the aggregate value of the claims of those classes. The objections to confirmation are denied.

The foregoing constitutes findings of facts and conclusions of law under Fed.R. Bankr.P. 7052. The Debtor is hereby ordered to submit an order of confirmation and all necessary implementing orders required pursuant to the Plan.